UNITED STATES DISTRICT COURT

Northern District of New York

6th Judicial Division

U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Mar 21 - 2025**

John M. Domurad, Clerk

_____ )
JANE DOE, JOHN DOE.                                )
                                                                     )     Case No.3:24-cv-274 (MAD/ML)
                                                                     )
                        Plaintiffs                             )
                                                                     )
            -against-                                         )
                                                                     )     **SECOND AMENDED COMPLAINT**
                                                                     )
                                                                     )
JONATHAN REES aka GREG ELLIS           )
aka JOHNATHAN REES aka JONNY REES   )
aka JACOB LORENZO                             )
                                                                     )
                        Defendant                          )
_____ )

Plaintiffs, Jane Doe and John Doe, pro se, as and for their Complaint hereby alleges, upon information and belief, as follows:

### THE PARTIES

1.     Plaintiffs are domiciled in the State of New York with a confidential address ordered by Honorable Judge Young, Broome Family Court.

2.     Jane Doe is a 23 year Film Veteran working in the Entertainment Industry as a Director, Writer and Producer, relying heavily on her reputation to earn a living to provide for her three minor children as their sole financial provider.

3.     John Doe dropped out of 11th grade after being forced to move to a new school due to the retaliatory abuse he faced from Defendant and Defendant's group of friends. At the new

school, he was placed in a situation that violated the Order of Protection, exposing him once again to harmful abuse, invasion of privacy, and falsehoods spread by Defendant. Fortunately, John Doe had already met the criteria for graduation, but the Defendant's tortious actions have significantly impacted John Doe's ability to pursue opportunities at Division 1 or Division 2 colleges to play tennis.

4.  Defendant Jonathan Rees, also known as Greg Ellis, is an actor and voiceover artist. His driver's license lists the address 2251 W Roscoe Street, Chicago, IL 60618 as his primary residence, as shown in the Illinois Department of Motor Vehicles abstract issued on November 30, 2023, indicating his intent to be domiciled in Illinois, where he remains sixteen months later. It is alleged that he splits his time between his primary residence and 1552 Country Squire Drive, Geneva, IL 60134. His mailing address, provided to Broome Family Court in January 2024, is 101, 1770 S. Randall Road, Suite A, Geneva, IL 60134-4646. Additionally, he purchased a property at 2309 Florimond Ave, Long Beach, IN 46360, around December 29, 2023, using proceeds from the sale of his previous home at 680 NY-220, Town of Smithville, Chenango County, NY 13801, which he sold just a day earlier, closing on the Indiana property on December 30, 2024.

5.  It is alleged that the Defendant fled New York in December 2023 in an attempt to evade criminal actions and defraud creditors, using multiple addresses outside of New York State, including an address in Arizona: 522 N Central Ave, #831 SMB#77452, Phoenix, AZ 85004, which is a virtual mailbox, in order to hinder service of the Order of Protection issued by Honorable Judge Young. This conduct further supports the assertion of diversity jurisdiction.

6.  Defendant Jonathan Rees, also known as Greg Ellis was previously domiciled in Upstate New York from December, 2021 until December 2023. He incorporated his company Monkey Toes Inc. in New York on the 14th June, 2022 and has conducted business in the State of New York. Defendant has reached out to multiple individuals in the entertainment industry based in both California and New York with the intention to interfere with Jane

Doe's business, fully aware that his actions would directly impact a New York resident. As such, he falls under the court's long-arm jurisdiction statute.

## JURSIDICTION AND VENUE

7.   This court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1) based on Diversity of Citizenship, in that the action is between a citizen of New York and a citizen or subject of a different state, and because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

8.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under federal law, including constitutional protections of privacy and rights related to personal dignity under Civil Rights Law § 52-b. Defendant's coercive tactics have resulted in forced labor conditions, violating federal law 18 U.S.C. § 1589. Additionally, 28 U.S.C. § 1367 provides for supplemental jurisdiction over state law claims, such as those under the New York State Human Rights Law (NYSHRL), when related to federal claims.

9.   Venue lies in this District and is appropriate pursuant to 28 U.S.C. § 1391, as the Northern District of New York is the judicial district in which a substantial part of the events forming the basis of the Second Amended Complaint occurred, where a substantial part of the evidence involved in the subject action is situated, and where the majority of the witnesses to the events forming the basis of the Second Amended Complaint reside. Furthermore, the defendant meets the requisite minimum contacts for jurisdiction in this District.

## PRELIMINARY STATEMENT

10.   On June 4, 2022, JANE DOE encountered Defendant JONATHAN REES, also known by various aliases including GREG ELLIS, JOHNATHAN REES, JONNY REES, and JACOB LORENZO, on the social media platform X (formerly Twitter). Jane Doe initially signed an agreement to work on Defendant's project, The Respondent. Over the course of several

months, Defendant engaged in a pattern of behavior commonly referred to as "love bombing," which ultimately culminated in the establishment of an intimate relationship between the parties.

11.  This relationship abruptly ended following an incident in which the Defendant assaulted Jane Doe, subjecting her to physical, mental, emotional, and financial abuse. Concurrently, he inflicted mental and emotional abuse upon Jane Doe's children, including John Doe, at his former residence in Chenango County, New York. This began on Thanksgiving Day 2022, involving the illegal possession of firearms and abusive tactics that created an atmosphere of fear and emotional distress, leaving Jane Doe and John Doe feeling as if they were walking on eggshells, constantly wondering if they would survive the next outburst.

12.  In response to these frightening and egregious acts, Plaintiff filed reports with the New York State Police, the Federal Bureau of Investigation (FBI), and the Chenango County Sheriff's Office. Subsequently, on April 17, 2024, a three-year full stay-away Order of Protection was issued in Broome Family Court for the benefit of Jane Doe, John Doe, and her minor children against Defendant.

13.  A hearing to address violations of the Order of Protection is scheduled for April 16, 2025, following a longstanding period during which Defendant has repeatedly violated the Order, harassing and causing harm to both Jane Doe and John Doe. Defendant's actions appear to reflect a calculated effort to undermine and destroy the lives of Jane Doe and John Doe through the intentional infliction of emotional distress, a vicious harassment campaign of falsehoods, defamation, and invasion of privacy.

## FACTUAL ALLEGATIONS

14.  On speaking with Defendant in June, 2022, he introduced himself as Greg Ellis, a 54-year-old actor and producer. He claimed to be close friends with Johnny Depp and mentioned that he was the CEO of a charity he founded called Children and Parents United ("CPU"),

as well as the Owner/CEO of a production company named Monkey Toes. He described Monkey Toes as an extremely successful production house involved in active projects with notable figures such as Johnny Depp, Alec Baldwin, Kiefer Sutherland, Demi Moore, Andy Garcia, Sharon Stone, and Stephen Fry, highlighting a film titled "The Respondent," which was reportedly green lit and produced by Adam Fogelson. Jane Doe was initially impressed by Defendant's respectful demeanor and kind words.

15. Jane Doe uncovered that the Defendant's true name was not Greg Ellis, but Jonathan Rees. She also found out that his charity, Children and Parents United (CPU), along with his production company, Monkey Toes, were far less successful than he had alleged. In reality, both organizations were in serious trouble, on the brink of collapse due to the Defendant's mismanagement and the misappropriation of over a million dollars.

16. Jane Doe was working 6 to 7 days a week, putting in 16-hour days on the production and the Defendant's charity. The Defendant's tactics ensnared her, as she was committed to protecting her professional reputation and not letting down those who depended on her, including the charity staff and the production crew she had assembled, all under the misconception fostered by the Defendant that his organizations were solvent.

17. When Jane Doe expressed her concerns and attempted to terminate the working relationship multiple times, the Defendant would emotionally manipulate her by claiming to be a flawed man grappling with personal issues, including a challenging divorce and PTSD, insisting that he was not adept in business. What began as guilt-tripping and emotional appeals soon escalated into threats of legal action.

18. The Defendant's erratic pattern of extreme highs and lows created a situation that led Jane Doe to believe that if she left and ceased providing her services, Defendant would suffer serious harm by hurting himself and she would be ruined financially and reputation wise.

19. When Jane Doe refused his requests, Defendant would feign illness, accidents or depression, and create larger issues for Jane Doe, further manipulating her into compliance.

20. The Defendant instilled fear in Jane Doe by threatening that investors would pursue legal action, not only against him, but also against her if she left. He claimed that her departure would lead to the failure of both the production and his charity, "Children and Parents United," and that she would be held liable as the lead producer and chair of the charity.

21. This was particularly distressing after Jane Doe had introduced crew, ambassadors, board members, and investors to support what appeared to be a genuine cause for helping abused children. Defendant falsely asserted that Jane Doe was responsible for securing the investment under deceptive pretenses, thereby placing undue blame on her.

22. Jane Doe traveled to Las Vegas to meet with investor Doug Ansell, incurring significant expenses that the Defendant did not reimburse. He had manipulated her into being the face of the production to secure financing—directing investors, their lawyers, and accountants to contact her. The Defendant falsely claimed that he did not have access to the bank accounts, misleading investors by suggesting that Jane Doe did, thereby redirecting their anger and legal disputes toward her.

23. Given that the Defendant had misappropriated substantial funds from both the production and the charity for personal use, rather than for their intended purposes of supporting the production and protecting children, Jane Doe's situation became extremely complicated. She felt uncertain about how to leave without facing serious repercussions, aware that if she did, her reputation would be severely damaged as the Defendant would shift the blame onto her, which is exactly what ultimately happened.

24. Production investor and charity board member Patrick Brennan, Esq., continued to reach out to Jane Doe via phone calls and text messages until the summer of 2024 regarding his investment, expressing frustration and anger over the situation. He requested financial documents and evidence to demonstrate that she wasn't involved in the Defendant's "scam" and asked for proof to support her claims, which she provided. Given that the Defendant is a known fraudster, she remains fearful of potential consequences from his crimes.

25. The Defendant even went so far as to instruct ex-Attorney General Dennis Vacco, Esq., to call Jane Doe, insisting that both of them required the same legal representation due to her involvement in his productions and charity, thus making her liable for his misconduct. During lengthy phone calls, Vacco discussed private details to provide legal advice to Jane Doe, who expressed her belief that it was not a good idea for them to share the same attorney, citing potential conflicts of interest. Vacco agreed with her concerns. The Defendant had repeatedly warned that she would "go down with him," and now it seemed his words were becoming a reality based on what he had confided to Vacco. Jane Doe felt terrified, sensing that the Defendant was trying to make her a scapegoat for his crimes and misappropriation of funds.

26. Defendant would often dangle the promise of payment as a manipulative tactic, insisting that if Jane Doe didn't trust him, she could reach out to various individuals who were supposedly responsible for disbursing funds. He frequently assured her that payment was on the way for all the hard work she was contributing, creating a false sense of hope. This "carrot" approach left her in a state of perpetual anticipation for herself and the crew, as each promised payment never materialized.

27. The combination of this unfulfilled promise, the constant threat of retaliation, and the pressure of potentially disappointing the investors and crew left Jane Doe feeling increasingly trapped. She felt a deep sense of embarrassment for having involved them in a situation fraught with uncertainty and deceit. Moreover, she experienced guilt over the idea of abandoning the crew, who had worked tirelessly on the production and charity.

28. Jane Doe was determined to ensure crew and staff were compensated for their efforts, unable to walk away and leave them behind, fearing that her inability to deliver on these promises would not only jeopardize their faith in her, but also ruin her decades long reputation in the entertainment industry, resulting in labor board complaints against her by staff and crew, and legal action by investors. She recognized that being associated with

such a troubling situation could tarnish her credibility and future opportunities, making it even more difficult to rebuild her career and reputation if she walked away.

29. While working together on the production for months, Defendant invited Jane Doe to stay at his home multiple times, including a weekend in October 2022, after months of intense love bombing. In early November 2022, he insisted that for the productions and charity to operate effectively, Jane Doe needed to relocate to New York due to the demanding hours and the nature of producing film and television projects.

30. Defendant had previously told Jane Doe that he had been single since his divorce from his ex-wife Dana Rees in 2015, and claimed to be suffering from PTSD and parental alienation.

31. Jane Doe experienced profound sadness over what she perceived as an injustice stemming from a tumultuous divorce, shaped by his misleading narrative, which she initially believed to be true. He published a book titled *The Respondent* and shared his story widely through appearances on Fox News, Dr. Drew, Greg Gutfeld, and various other media platforms. Given his book and media presence, Jane Doe could never have imagined that his version of events was anything but true.

32. Defendant was subject to a Domestic Violence Restraining Order granted in October 2022, following two Domestic Violence Restraining Orders previously issued to his ex-wife, Dana Rees, in 2015 and 2016. Throughout this period, he claimed he was being targeted as a Hollywood star, suggesting that the allegations were lies intended to silence him.

33. Jane Doe suffered hatred from groups of women for allegedly supporting an abuser, impacting her brand and a further loss of income due to her association with Defendant.

34. As details of Defendant's family court case circulated on social media, several projects that Plaintiff had worked on for months, with promises of payment, were ultimately shut down.

35. The Defendant remained resolute, emphasizing the need for Jane Doe to support him as his production partner and intimate partner. Given his persuasive demeanor, she found herself believing him.

36. The Defendant informed Jane Doe that he had invited several guests for Thanksgiving, including his talent manager, Thomas Harrison, and his family. To be efficient, Jane Doe and her minor children decided to relocate to New York for the production since they were already going there, and agreed to stay at the Defendant's property until after New Year's, given that the production office was located in a cabin on his land. They planned to leave after closing on a property Jane Doe was purchasing in Oxford, NY, which is about a 15-minute drive from the Defendant's home.

37. Upon arrival, Jane Doe discovered they were the only guests at the isolated property, where Defendant committed multiple acts of violence against her, including physical, mental, emotional, and financial abuse.

38. While intoxicated, the Defendant would ridicule Jane Doe, claiming that her boys weren't men but rather "mummy's boys" who were too soft. He insisted that he would make men out of them.

39. He also subjected John Doe to mental and emotional abuse, brandishing an illegal firearm, a powerful shotgun, while inebriated and insisting on taking John Doe out hunting beavers in the dark, which frightened Jane Doe resulting in a high stakes argument as she wouldn't allow John Doe, a minor at the time, or her other children to go with Defendant given Defendant was acting reckless and dangerous. John Doe had never interacted with firearms before this encounter and has not since.

40. Shortly after arriving at Defendant's home, he informed Jane Doe that his $3,500 rent deposit had bounced, leaving him confused about why his ex-landlady in Los Angeles, Debbie Bernstein, would do that. Despite Jane Doe being a guest at his home for Thanksgiving, he insisted that she pay him $3,000. Feeling too embarrassed to refuse and uncertain of the consequences, she sent him the money via Apple Pay.

41. From November 24, 2022, to December 6, the Defendant yelled at and verbally abused Jane Doe daily. Despite her attempts to leave his home multiple times, she was instead drawn into high-stakes conversations that began to take a toll on her.

9

42. During Thanksgiving 2022, the Defendant slammed Jane Doe's MacBook down forcefully onto her hands, causing her fingers to hurt and making her cry from the pain. He reacted this way because he believed Jane Doe was not paying attention to him while he was speaking.

43. During Thanksgiving Break 2022, the Defendant began drinking each day around 1 PM. By 3 PM, he would be extremely intoxicated and start yelling at Jane Doe for not cooking the peas the way he instructed or for failing to resolve an issue he had with his ex-landlady. He even used Jane Doe's phone to send threatening texts to Debbie Bernstein, demanding the return of his rent deposit, which he insisted was "his money that she was stealing" and warned her that "she would return it or else."

44. The Defendant was fixated on blaming Jane Doe for his troubles with the production and personally, resulting in hours of incoherent verbal abuse directed at her on a daily basis.

45. The Defendant would turn even minor issues into dramatic confrontations. For instance, if a stool was not pushed back into place after Jane Doe's children finished eating, he would yell abusive comments at her for anywhere from a few minutes to hours. At times, he seemed to catch himself and would switch to shouting "please don't hurt me" as he ran away from Jane Doe to seek refuge with John Doe and his siblings. He would then cocoon them in one room, hugging them tightly while claiming he was protecting them from their mother, insisting that she was having a panic attack and a mental breakdown. He portrayed himself as their protector, asserting that Jane Doe was acting irrationally and needed mental intervention, which frightened John Doe, and Jane Doe's other two children. This pattern occurred daily.

46. One evening during Thanksgiving break 2022, the Defendant's verbal abuse towards Jane Doe escalated to an outrageous level. In response, she declared, "Enough is enough; we're leaving right now." As she exited the kitchen, the Defendant yelled after her, calling her selfish, a low-class bitch with mental issues. He insisted that she had to stay because he had

invited Matthias Wesner over for dinner and wouldn't allow Jane Doe to embarrass him by her absence. He also expected her to cook for the occasion.

47. At that moment, Ring notified the Defendant that someone was on his property—Matthias Wesner had arrived for dinner. He handed Jane Doe his cocktail and warned her not to embarrass him, threatening that the situation would worsen if she did. Jane Doe and her children were introduced to the Defendant's guest, who identified himself as Matthias Wesner. He explained that he owned a production company in Sidney, New York, as well as a bagel factory, and that he had been introduced to the Defendant by their mutual friend Ronnie DeVito in the summer of 2022.

48. The Defendant and Jane Doe went into the kitchen alone, where he told her he accepted her apology for making him angry. He claimed they could quickly heal their rift and held her tightly, insisting they were best friends. He expressed his love for her cooking and asked how long it would take her to make the Thai Curry Soup. The Defendant then directed everyone on where to sit, insisting that Jane Doe sit next to him, opposite Matthias Wesner.

49. After the meal finished and Jane Doe's children were excused from the table, she, Matthias Wesner, and the Defendant sat together, drinking Sambuca.

50. Matthias and the Defendant spoke freely about guns in front of Jane Doe, with Matthias declaring himself a firearms expert. He proudly mentioned that he had selected the guns for the Defendant, who had multiple firearms on his property during Jane Doe's and her children's stay. At this point, Jane Doe was unaware that the Defendant was ineligible for firearms.

51. Defendant was fully aware that he was prohibited from possessing firearms due to Title 18 Mentally Defective, his drug addiction and the Domestic Violence Restraining Orders against him. The FBI/DOJ sent Defendant a rejection letter denying his firearm application on August 24, 2022.

52. Knowing this information did not stop the Defendant from violating Federal and New York State Laws by illegally possessing firearms, thereby recklessly endangering Jane Doe and John Doe.

53. Over several months, the Defendant would call Jane Doe on FaceTime while hunting beavers late at night, claiming, "I'm bringing you with me on my adventures" as he shot the animals on his property.

54. Jane Doe found it disturbing to witness beavers being shot and screaming in pain, with the Defendant taking multiple shots to kill each one. He seemed to take pleasure in their suffering. As a vegetarian, Jane Doe struggled to understand this violence, which included the Defendant using Semtex to blow up entire families and setting their dams on fire, even killing the young. Having lived by the beach for many years without the need for a firearm or harming wildlife, Jane Doe tried to keep an open mind, considering the Defendant's remote property and his claim that he needed to control the beaver population. However, she was deeply fearful and disturbed by the way the Defendant smirked, appearing to enjoy the killing.

55. During Thanksgiving Break 2022, Jane Doe's children told her in the Defendant's kitchen that Defendant was a creep and that something felt off about him.

56. They revealed that he had been inappropriately hugging her 12 year old daughter and even climbed into bed with her, insisting on wrapping his arms around her in an intimate embrace to read her a bedtime story.

57. Fearing for their safety, the children asked Jane Doe if they could leave his house immediately. She explained that they couldn't leave right away because it was dark in the middle of nowhere, but she had booked a hotel in Vestal, NY, for the next day and promised they would leave in the morning.

58. Jane Doe, trying to keep the situation light, thanked the Defendant for hosting them but informed him they would be leaving earlier than planned the next morning. The Defendant reacted poorly, crying and behaving like a wounded animal. Fearing retaliation, Jane Doe

agreed to his suggestion that they come back for Christmas and New Year's Eve, even though she had no intention of doing so. Given their fear of the Defendant, it was crucial for them to leave without provoking any further aggressive outbursts or violence, either towards her, John Doe, or her other minor children, and to avoid leaving under a dark cloud as she began to recognize the serious repercussions of distancing herself from him.

59. Jane Doe packed her Vitamix and other personal kitchen items into a Trader Joe's shopping bag and placed it by the front door. She then asked her children to pack their bags while she prepared to leave early.

60. On the last night at the Defendant's home, Jane Doe woke up just after 2 AM to find the Defendant standing over her, holding a cigar and watching her while extremely intoxicated. His intimidating presence filled her with fear, especially considering his unstable and aggressive behavior. For two hours, he pulled the sheets and covers off her, eventually forcing her out of bed by yanking her up by her shoulder and hair, all while still holding the cigar. At one point, he trapped her neck and face with his hand and forearm after falling onto her in his drunken state, causing cigar ash to fall onto her face.

61. Exhausted and with no energy left to fight, Jane Doe lay on the floor after being dragged out of bed. She finally succumbed and went downstairs to talk, only to endure three hours of emotional, mental, and verbal abuse from the Defendant. He criticized her for everything he believed she had done wrong that day, lecturing her on how to improve her communication and relationships, accusing her of being a bad mother, failing in her role as a producer, and needing to become a better writer to collaborate with him. Most importantly, he emphasized that she had broken the "Golden Rules," which he deemed unforgivable and would not tolerate.

62. Jane Doe didn't get any sleep that night, choosing to shower while her children were still sleeping, and to leave as early as possible. While she was in the shower, the Defendant violently removed John Doe from his house. He placed their belongings—half packed and

half unpacked—onto his driveway, along with Jane Doe's other two children and their dog, Wolfie.

63.   The Defendant physically insisted that Jane Doe get out of the shower by pulling her out by her arm, pressuring her to quickly throw on clothes under the impression that there was an emergency. He then led her down the stairs to where her children were waiting outside.

64.   Once outside, the Defendant closed the front door and drew all the curtains in the house.

65.   Feeling humiliated and embarrassed for John Doe and her other two children, who had never experienced such dysfunction, Jane Doe began packing their personal belongings into bags. It took her a couple of hours in the freezing cold to pack everything into the car for a single trip. While packing, she noticed that her items left at the front door, including her Vitamix and accessories worth over $1,500, were missing.

66.   As a filmmaker, Jane Doe frequently carries her camera equipment. Since she and the Defendant were producing a documentary series called *The Respondent*, which she had written and broken down episodically, she was actively interviewing experts and filming B-roll footage. To support this project, she brought over $100,000 worth of camera gear, an iMac, and MacBooks from Los Angeles to the Defendant's house.

67.   Jane Doe requested access to the cabin designated as the production office for the documentary series *The Respondent*, which had a signed two-year lease from the Defendant. However, the Defendant refused to grant her access to retrieve her camera equipment, iMac, and MacBooks.

68.   To date, he has not returned her Vitamix, accessories, or other expensive items.

69.   For three days, Jane Doe contacted the Defendant, pleading for the return of her camera equipment, which she needed for her role as producer and director, as well as her iMac and MacBooks for post-production. She grew increasingly concerned that he would not return her items.

70. Jane Doe sent Defendant a text message via iMessage, insisting that the Defendant allow her to pick up her film equipment at 10 AM the next day, warning that she would have no choice but to call the Chenango Sheriff if he refused.

71. The Defendant angrily responded to Jane Doe, stating he was at the New York State Police in Chenango County filing a report. He shamed her for lacking compassion and empathy, portraying himself as a victim to law enforcement. He questioned why she hated him, even though all Jane Doe wanted was to retrieve her film equipment from his property, which she needed for her job, causing her significant anxiety and stress.

72. On December 9, 2022, Jane Doe arrived alone at the Defendant's property around 11 AM to avoid any further violence against her children. She found all her camera equipment, iMac, and MacBooks left outside intentionally unpacked on his driveway in the rain. Upon documenting the situation, she noticed several items were missing from the inventory, including a cracked 5K monitor and other camera equipment that had been damaged by the rain. Jane Doe asked the Defendant about her missing items, including an Apple Magic Trackpad, Apple Mouse, and Wireless Keyboard, but he denied taking them. He eventually returned these items to her a few months later, in February 2023. However, he never compensated her for the damaged equipment or replaced it.

73. Around December 10th, the Defendant, in a drunken state, called Jane Doe and warned her to be careful about whom she spoke to regarding events at his home. He insisted that Andrew Bishop was a "snake, rat, and clown" and told her not to communicate with Ajit Ninan, Andrew Bishop, Thomas Harrison, or Eric Foster again. He could not explain why, but insisted they were not good for her and demanded she promise to block them from her life. The Defendant also claimed he had video footage of Jane Doe and her children recorded secretly on his Ring cameras, including footage from inside the bedrooms and bathrooms.

74. Jane Doe immediately felt violated and sick to her stomach, sensing that she was being extorted. She was concerned that the Defendant might have videos of her and her children

while they were naked—coming out of the shower or changing for bed—and feared he wouldn't hesitate to distribute them if she wasn't compliant.

75. This raised alarm about how he knew details from her private phone calls made in the bedroom while she was staying at his home.

76. In December 2022, Jane Doe blocked the Defendant on X (formerly Twitter) and Instagram. In January 2023, she also blocked him on Facebook and LinkedIn, and he has remained blocked since then.

77. From December 2022 to February 2023, the Defendant called Jane Doe multiple times a day, relentlessly pursuing her until she picked up. When she ignored him, he began contacting people around her, including her ex-landlord, Thomas D'Angelo. On one occasion, while Jane Doe was with D'Angelo and his brother at their rental property, D'Angelo received a call from the Defendant and passed the phone to Jane Doe, saying, "It's Greg for you." This created an embarrassing situation, as the Defendant refused to accept Jane Doe's decision to cease all communication. His actions were an invasion of her privacy, further intensifying her distress.

78. The Defendant left multiple voicemails for Jane Doe, insisting that he loved her and reciting "If—" by Rudyard Kipling, knowing it was one of her favorites.

79. Jane Doe ignored the Defendant's love bombing, prompting him to change his strategy to one of depression and suicidal threats in February, 2023. These manipulative strategies ultimately succeeded in compelling Jane Doe to return to Defendant's previous residence numerous times in Chenango County to provide care for him leading to hours of phone calls where she tried to talk him off the ledge.

80. During these conversations, the Defendant cried hysterically, claiming that Private Investigator Kevin Berman was going to kill him and that his ex-girlfriend and ex-wife had teamed up and were out to ruin him. He expressed that if he didn't end up dead, he would be in prison for the rest of his life. Jane Doe was traumatized by the Defendant's behavior.

81. On February 24th, 25th, and 26th, 2023, at the Defendant's pleading, Jane Doe visited him at his barn. However, he refused to talk, insisting they communicate by writing on a piece of paper. He was convinced he was being recorded, even asking Jane if she was wearing a wire and requesting that she leave her phone in the car, turned off. Due to below-freezing temperatures and no heat in the barn, Jane told the Defendant after an hour that she was leaving because she was freezing cold. He then agreed to move to his cabin so she could help him through his depression and suicidal tendencies. Prior to her arrival, the Defendant had texted Jane Doe that his house was bugged, but provided no explanation for how he knew.

82. The Defendant was overly dramatic, at one point falling off the sofa and rolling on the floor, crying that his life was over. Jane Doe was deeply concerned by his actions and found it hard to sleep during this time period, unsure of how to help him, especially since he refused any mental intervention. She helped him off the ground multiple times, only to see him feign shaking and falling over again, which began to look staged. Jane started to recognize a pattern of abuse and manipulation in the Defendant's behavior and felt trapped in the situation, unsure how to escape without becoming a target herself.

83. Jane Doe had never experienced anyone manipulating her emotions as cruelly and callously as the Defendant did. He lied to her about being suicidal, and at that stage, she was unaware that this behavior was part of a long-standing pattern of abuse he had mastered over the years.

84. During this time, Jane Doe experienced significant physical, mental, and emotional distress due to Defendant's threats to take his own life. Despite her attempts to distance herself, Defendant continued to refuse to accept her decision, frequently appearing unannounced at Plaintiffs home in Broome County, including around 7am on the 27th February, 2023, instilling fear and attempting to coerce Jane Doe into resuming both a personal and professional relationship. He utilized manipulation, threats, and guilt, suggesting that his suicide would be a consequence of her actions.

85. In March 2023, Jane Doe ultimately severed all communication with Defendant and once again reported his suicidal ideations and violent behavior to law enforcement. Despite these reports, Defendant escalated his previous threats, vowing to destroy Jane Doe and harm her family, with such intimidation continuing to the present day.

86. Defendant sent a series of threatening messages claiming he was going to kill himself, stating that "they were in danger," that "her reactivity would get them killed," and advising her to "keep your children safe," among other alarming communications, via iMessage, Signal, and Beacon.

87. From March, 2023, Defendant has continued to monitor Jane Doe, John Doe, and her other children, invading their privacy. He has contacted her ex-landlord to ask if they still lived at his property and seeking additional personal information. This behavior has been worrisome. He and his friends have also reached out to family members, including Jane Doe's 12-year-old daughter, arranging meetings and dinners with many individuals in her circle, such as Eric Kohn from the Koffman Incubator, who was working with Jane Doe on her business.

88. Jane Doe filed further police reports in May, June, and July 5, 2023, with the FBI, New York State Police, and Chenango Sheriffs due to the ongoing harassment and stalking. Her final conversations with Lt. Barton and Sgt. Justin Davy occurred on July 19, 2023, when the Chenango Sheriffs retrieved a firearm from the Defendant who claimed to have found it on the side of the road. Chenango Sheriffs refused to comply with a court order to remove all his firearms.

89. On August 8, 2023, the complainant filed false accusations against Jane Doe in Chenango County, constituting malicious prosecution.

90. Jane Doe believes his single complaint against her to his friends in Chenango Sheriffs is in retaliation for her numerous police reports concerning assault, harassment, stalking, threats, his misappropriation of millions in production and charity funds, fraud, and identity theft.

91. It appears the Defendant was prepared to contact Jane Doe's board members, business associates, management team, and crew involved in her latest film project on August 8, 2023, just hours after filing his complaint against her.

92. Before she had even left the interview with the Chenango Sheriffs, the Defendant had already distributed an edited video falsely alleging that Jane Doe had attempted to murder him, using it to support his claims that Jane Doe was dangerous, portraying himself as a victim to her management team and business associates.

93. The Defendant's retaliation campaign began immediately, involving multiple false reports to Child Protective Services (CPS) and John Doe's school, alleging that Jane Doe was dangerous, mentally ill, suffering from a personality disorder, a drug addict, and an abuser of her children. As a result of the Defendant's actions, John Doe experienced severe emotional distress from multiple interrogations by CPS officers, school counselors, and police officers at school, and at home.

94. Jane Doe, John Doe, and their family had to move immediately due to the abuse they were experiencing, with Jane Doe aware, based on his history, that this was just the beginning.

95. In mid to late August 2023, the Defendant disseminated two derogatory websites featuring Jane Doe's name in the URL. These sites were filled with videos, photos, and falsehoods about her and her children, violating their privacy and dignity through torts such as appropriation of name or likeness, intrusion upon seclusion, false light, and public disclosure of private facts, as well as the right of publicity. Additionally, aggressive and vile social media posts were created with the help of his friends to ridicule and intentionally harm both Jane Doe and John Doe.

96. The websites contain edited videos from the Defendant's Ring cameras. These harmful actions by the Defendant and his friends, including Vem Miller, were intended to harass and undermine Jane Doe's reputation, destroy her business, and harm both her and John Doe. As a direct consequence of the Defendant's defamatory actions, civil violations, and privacy

torts, board members withdrew from Jane Doe's business, and contractors and crew associated with her latest film project, also terminated their involvement.

97.    The Defendant contacted several individuals within Jane Doe's circle, violating the civil rights, privacy, and seclusion of both Jane Doe and John Doe. He sent a website link to Jane Doe's ex-husband, who is John Doe's father, resulting in him sharing the link with Jane Doe with "nice". This appears to be a deliberate attempt to create discord among them and cause issues for all three of Jane Doe's children with their father. Additionally, the Defendant maliciously claimed on his website and social media that Jane Doe had children with a child sex offender, questioning her concern for children and exacerbating the harm he seeks to inflict, resulting in extreme emotional distress for both Jane Doe and John Doe.

98.    Furthermore, her sales agent and distribution partners terminated their relationship with Jane Doe after being presented with the misleading website ending in .info, created by the Defendant and his group of enabling friends who targeted Jane Doe and John Doe. The website, filled with falsehoods and distorted videos, supported the Defendant's malicious narrative against her. This constitutes egregious intentional interference with prospective economic advantage and tortious interference with both existing contracts and potential business opportunities.

99.    Based on belief and knowledge, the Defendant has been institutionalized multiple times in various mental health facilities over the years; however, he is not considered incompetent.

100.    Based on belief and knowledge, Law enforcement have been called to assist many of his alleged victims, who claim he committed domestic violence against them. Instead of arresting him, the police often placed him on 5150 and 5152 holds due to his mental illnesses, transporting him directly to mental health facilities.

101.    To Jane Doe's knowledge and belief, the Defendant has been diagnosed with narcissistic tendencies, sociopathy, bipolar, depression, PTSD, and an undiagnosed personality disorder. His condition is believed to have worsened over the years due to his cocaine and

alcohol addiction, for which he has received treatment in addiction facilities numerous times.

102. Since August 8, 2023, the Defendant, a Hollywood actor with a massive following, has managed to convince several individuals, including former Judge Rick Miller, II, Esq., and Justice Jordan Lilley of the Smithville Town Court, to do his bidding. Both have participated in ex-parte communications and obstructed justice, with Justice Lilley issuing multiple Orders of Protection against Jane Doe despite jurisdiction being under Judge Revoir, all to benefit the Defendant and harm Jane Doe.

103. Based on the criminal and harassing behavior of the Defendant's friends, Jane Doe had no choice but to file complaints with the Commission for Judicial Conduct and the Attorney Grievance Committee.

104. Law enforcement in Broome and Chenango Counties, eager to support him, have been willing to lie and cover for his crimes, believing his false narrative that all women are bad and that he is a victim due to his status as an actor and elite friendships, including those with Alec Baldwin and Johnny Depp.

105. After Judge Revoir appointed a Special Prosecutor from a different district, Defendant was indicted and subsequently arraigned on December 20th, 2024 for crimes against another woman. The grand jury charged violations of the following statutes: N.Y. P.L. § 175.35(1) (offering a false statement for filing in the first degree); N.Y. P.L. § 210.05 (perjury in the third degree); N.Y. P.L. § 210.45 (making a punishable false written statement); N.Y. P.L. § 250.45(1) (unlawful surveillance in the second degree); N.Y. P.L. § 135.60(3) (coercion in the third degree); N.Y. P.L. § 135.60(5) (coercion in the third degree); N.Y. P.L. § 135.60(9) (coercion in the third degree); N.Y. P.L. § 240.30(1A) (aggravated harassment in the first degree); N.Y. P.L. § 245.15 (unlawful dissemination or publication of an intimate image).

106. The Defendant has relentlessly pursued his vicious campaign against Jane Doe and John Doe, even going so far as to violate Orders of Protection. Just two weeks ago, a friend of Defendant contacted Honorable Judge Young in Broome Family Court in an attempt to

manipulate the violation petition against him, believing he could influence another judge. This strategy backfired, resulting in Judge Young's recusal and the appointment of Judge Gorman to preside over the trial set for April 16, 2025.

107. Meanwhile, the Defendant has inundated Broome Family Court with repeated motions, all of which have been denied, aiming to exhaust Jane Doe and place additional strain on her attorney and the judicial system.

108. This intense behavior has left Jane Doe hyper-vigilant and suspicious of attorneys, judges, and law enforcement, unsure of whom she can trust or who he might have influenced. This ongoing situation is severely barbaric, invasive, and traumatizing, leading to health complications and weight gain for her and frightening for her family.

109. Compounding the danger, the Defendant has enlisted a group of men to hunt for Jane Doe, John Doe, attempting to locate their residence. Once they succeed, they post this information online doxing them, forcing the family to relocate and increasing the peril for Jane Doe and John Doe. Property owners who previously had good relationships with Jane Doe and John Doe have turned aggressive after the Defendant contacted them, sharing derogatory falsehoods and websites, effectively rallying a small army of men against her and her children.

110. It appears Defendant will not stop until Jane Doe and John Doe are completely destroyed.

111. The Defendant has inflicted emotional distress on Jane Doe and John Doe, and has committed privacy and dignitary torts, including appropriation of name or likeness, intrusion upon seclusion, false light, public disclosure of private facts, defamation, and harassment.

112. Accordingly, the Plaintiffs bring this action seeking injunctive, declaratory, and monetary relief against the Defendant for civil violations, intentional infliction of emotional distress, intentional interference with prospective economic advantage, tortious interference with contract and prospective economic advantage, sexual harassment, gender discrimination, and hostile work environment, forced labor, identity theft, and forgery.

**FIRST CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress)**

**Jane Doe and John Doe Against Defendant Jonathan Rees aka Greg Ellis**

113.    Plaintiffs repeat and realleges the allegations stated above as if fully set forth herein.

114.    Defendant has engaged in the intentional, extreme, and outrageous conduct, which caused Jane Doe and John Doe severe distress.

115.    The illegal possession of firearms by Defendant, along with the reckless behavior of brandishing these weapons, instilled a profound sense of fear and anxiety in Jane Doe and John Doe. In a particularly alarming incident, Defendant attempted to coerce John Doe and Jane Doe's minor children into going out hunting beavers in the dark while under the influence of alcohol.

116.    Defendant's conduct was not only dangerous but also blatantly irresponsible. The sight of a firearm being waved around carelessly, combined with the threat of being forced into a perilous situation, created an atmosphere of terror for Jane Doe and John Doe. They were left feeling helpless and deeply concerned for the safety of themselves and Jane Doe's minor children, knowing that such reckless actions could lead to severe harm or even fatal consequences.

117.    The emotional turmoil caused by this incident was significant. Jane Doe and John Doe experienced heightened anxiety, sleepless nights, and a pervasive sense of vulnerability. Their ability to feel secure was shattered, leading to ongoing distress and fear for their family's well-being. This reckless behavior was not just a threat to physical safety but also a profound violation of their emotional peace, causing lasting effects on their mental health and family dynamics.

118.    Defendant unlawfully disseminated videos of Jane Doe on two exclusive websites containing falsehoods about Jane Doe and John Doe. These actions constituted serious violations of privacy and dignity, including: Appropriation of name or likeness, Intrusion

upon seclusion, False light, Public disclosure of private facts. By spreading these falsehoods, Defendant not only invaded the privacy of Jane Doe and John Doe, but also severely harmed their reputations and emotional well-being.

119. Defendant possessed and disseminated videos, photos and text of Jane Doe and John Doe, sharing social media posts about Plaintiffs with Falsehoods, Privacy, and Dignitary Torts: Appropriation of name or likeness, Intrusion upon seclusion, False light, and Public disclosure of private facts.

120. Defendant also contacted Jane Doe's board members, contractors, film crew, management team, charity staff Jane Doe worked alongside, and Jane Doe and John Doe's friends and his school, falsely reporting that Jane Doe was dangerous, an attempted murderer, fraud and thief, and that John Doe's father is a child sex offender who had abused him.

121. Defendant undertook these actions with full knowledge that they would result in irreversible and lifelong consequences for Jane Doe and John Doe, particularly given that John Doe was a minor when Defendant initiated his hate campaign. This deliberate conduct has had a profound and detrimental impact on their mental well-being.

122. Defendant's conduct was so extreme in degree and so outrageous in character that it goes beyond all possible bounds of decency.

123. Defendant's sole purpose in sharing videos, social media posts and derogatory websites was to harass and/or embarrass Plaintiffs and cause them harm.

124. Defendant intended to cause severe emotional distress or recklessly disregarded the likelihood that such conduct would tend to cause severe emotional distress. Such outrageous behavior is beyond the limits of decency and is intolerable in a civilized society.

125. As a direct and proximate result of Defendant's conduct, Plaintiffs suffered severe emotional distress.

126.    Defendant acted with the intent to cause severe emotional distress, or alternatively, disregarded the substantial probability that his actions would cause severe emotional distress.

127.    Here, the acts of Defendant were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that his actions would harm Plaintiffs reputation and mental well-being, that, in addition to all the damages inflicted upon Plaintiffs and in addition to all the measure of relief to which Plaintiffs may properly be entitled herein, Defendant should also be required to pay punitive damages to punish him for his reckless conduct in the further amount greater than the jurisdictional limit of all lower courts to be determined by the trier of fact, in order to deter him and others similarly situated from engaging in such conduct in the future.

128.    Plaintiffs demand judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiffs for their severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiffs, together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## SECOND CAUSE OF ACTION

**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL")**

**Jane Doe Against Defendant Jonathan Rees aka Greg Ellis**

129.    Plaintiffs repeat and reallege each and every allegation in all preceding paragraphs as if fully set forth herein.

130.    Defendant discriminated against Jane Doe on the basis of her gender in violation of the NYSHRL by subjecting her to disparate treatment based on her gender. This included, but

was not limited to, incidents of assault and harassment, as well as creating a hostile work environment that undermined her professional standing and well-being.

131. The Defendant's actions included inappropriate comments, unwanted physical contact, and a pattern of behavior that objectified Jane Doe, contributing to a work atmosphere that was both demeaning and intimidating. These pervasive actions not only violated Jane Doe's rights but also created a toxic environment that made it impossible for her to perform her duties without fear of further harassment.

132. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Jane Doe has suffered and continues to suffer significant monetary and economic harm, including lost wages, and diminished career opportunities. She is entitled to an award of compensatory damages to address these economic losses and restore her financial standing.

133. Additionally, Jane Doe has endured severe mental anguish and emotional distress due to the Defendant's actions. This distress has manifested in stress, weight gain, health issues, and a profound sense of violation, resulting in ongoing psychological trauma. She is entitled to an award of damages that reflect the gravity of her suffering and the impact on her daily life.

134. Defendant's unlawful and discriminatory actions were intentional and carried out with malice, demonstrating a deliberate, willful, and wanton disregard for Jane Doe's rights under the NYSHRL. This reckless indifference warrants an award of punitive damages, aimed at deterring such egregious conduct in the future and holding the Defendant accountable for his actions.

135. This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injuries suffered as a result of conduct that constitutes abuse under New York Penal Law. Such acts and/or

omissions were committed against Jane Doe when she was over eighteen years of age, and thus, she is entitled to pursue these claims for redress.

## THIRD CAUSE OF ACTION

### (Violation of Civil Rights Law §52-b)

### Jane Doe and John Doe Against Defendant Jonathan Rees aka Greg Ellis

136. Plaintiffs repeat and realleges the allegations stated above as if fully set forth herein.

137. Plaintiffs had a reasonable expectation that the videos recorded on Defendant's property, where they were invited guests, would remain private. This expectation extended to Ring videos captured during their stay, as Plaintiffs were unaware that they were being recorded and had not provided consent. Such actions constitute unlawful surveillance, violating the civil rights of Jane Doe and John Doe under §52-b.

138. Defendant unlawfully possessed and disseminated videos of Jane Doe on websites he created with the assistance of his enabler friends. This included a manipulated video of Jane Doe walking on Defendant's property, edited to present her in a nefarious light and to propagate falsehoods about her.

139. Defendant shared two exclusive websites about Jane Doe and John Doe that contained falsehoods and engaged in various privacy and dignitary torts: Appropriation of name or likeness, Intrusion upon seclusion, False light, and Public disclosure of private facts. These actions not only violate the privacy rights of Jane Doe and John Doe but also contribute to emotional distress and reputational harm, as they were based on falsehoods and misrepresentations.

140. The content distributed by Defendant on the exclusive websites and on social media about Jane Doe and John Doe is a violation of their civil rights §52-b, an invasion of their privacy, intrusion upon seclusion and public disclosure of private facts.

141.  Defendant disseminated and published videos, photos, names, emails, texts of Jane Doe and John Doe without Plaintiffs permission or consent in violation of their civil rights §52-b.

142.  Defendant threatening to disclose videos recorded of Plaintiffs captured at his home without their knowledge or consent, to extort them, with a real fear he will disseminate this content, is a violation of Jane Doe and John Doe's civil rights §52-b.

143.  Defendant disclosing private information is a violation of Plaintiff's civil rights §52-b, an invasion of their privacy, intrusion upon seclusion and public disclosure of private facts, advertising this information on the internet with it's own unique URL's.

144.  Defendant's sole purpose in sharing videos, social media posts and exclusive derogatory websites was to harass and/or embarrass Plaintiffs and cause them harm and emotional distress, an invasion of their privacy, intrusion upon seclusion, defamation, false light, and public disclosure of private facts, in violation of their civil rights §52-b.

145.  Defendant's threats to Plaintiffs of sharing content captured in the privacy of his Guest bedrooms and bathrooms were for the purpose of harassing, annoying, or alarming Plaintiffs and in retaliation for filing police reports against him and decision to cut off communication in violation of their civil rights §52-b.

146.  Defendant contacted John Doe's school and disseminated falsehoods, which constitutes an invasion of privacy and a violation of the civil rights of John Doe and Jane Doe under §52-b. As a result of these actions, John Doe and his siblings were interviewed multiple times by their counselor regarding the phone calls received about their mother and claims of child abuse. Additionally, John Doe was removed from school twice for significant periods disrupting his education, until Jane Doe filed an appeal with the Education Authority to return her children back to their school. This not only undermines the trust placed in educational institutions, but also causes significant emotional distress to the family by Defendant spreading misinformation and damaging their reputations, creating fear in their school.

147.    Defendant submitted at least eight false reports to Children and Protective Services (CPS) with the intent to have Jane Doe's three children removed from their family unit, fully aware that these reports were untrue. This malicious action constitutes a violation of the civil rights of John Doe and Jane Doe under §52-b. As a result, John Doe and his siblings were interviewed by multiple CPS officers, who thoroughly examined their home, including the children's bedrooms and their lives, in search of the alleged wrongdoings claimed by Defendant. Such conduct not only undermines the integrity of the family unit but also inflicts significant emotional distress and harm on the individuals involved.

148.    As a result of Defendant's actions, Plaintiffs demand judgment for any actual damages which exceed the jurisdictional limits of all lower courts, which would otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation, injunctive relief preventing Defendant from further disseminating videos or images from videos captured at his home, and such other relief as the Court deems equitable and just.

## FOURTH CAUSE OF ACTION

**(Tortious Interference with Contract/Prospective Economic Advantage)**

**Jane Doe Against Defendant Jonathan Rees aka Greg Ellis**

149.    Plaintiffs repeat and reallege each and every allegation in all preceding paragraphs as if fully set forth herein.

150.    By placing false calls and sending deceptive texts and emails to Jane Doe's talent management agency, publicists, business associates, sales agents, and distributors—both directly and through Defendant's enablers across New York State, California, the United Kingdom, and Canada—Defendant intentionally and unlawfully interfered with Jane Doe's existing affiliations and prospective business opportunities.

151.    This interference not only disrupted her professional relationships but also jeopardized her reputation within the industry, leading to significant financial and emotional

repercussions. Defendant's actions created an environment of distrust and uncertainty among her professional contacts, severely damaging her credibility and standing in the entertainment field.

152. By engaging in such malicious conduct, Defendant acted with the sole purpose of harming Jane Doe, demonstrating a clear intent to sabotage her career. His actions were not merely reckless but calculated, reflecting a deliberate strategy to undermine her success.

153. Furthermore, Defendant employed improper and illegal means, which amounted to criminal acts and constituted independent torts, including but not limited to defamation and harassment. This calculated interference not only undermined Jane Doe's professional standing but also inflicted severe emotional distress, compounding the damages suffered as a direct result of Defendant's actions.

154. As a proximate result of Defendant's tortious interference, Jane Doe has suffered substantial economic losses, including lost contracts, diminished business opportunities, and reputational harm. These losses have had a lasting impact on her career trajectory, warranting both compensatory and punitive damages to address the full extent of the harm inflicted upon her.

155. Jane Doe seeks an award of compensatory damages to cover her economic losses, as well as punitive damages to deter Defendant from engaging in such malicious conduct in the future and to hold him accountable for the profound impact of his actions on her life and career.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Prospective Business Relations)
### Jane Doe Against Defendant Jonathan Rees aka Greg Ellis

156. Plaintiffs repeat and reallege each and every allegation in all preceding paragraphs as if fully set forth herein.

157. Jane Doe is a Professional Filmmaker actively working in the Entertainment Industry as a Director, Producer, and Writer, with affiliations to multiple prestigious talent agencies and production houses throughout New York State and Los Angeles, California. Her professional reputation is paramount to her success, directly influencing her ability to secure projects and collaborate with top-tier talent.

158. In her capacity, Jane Doe is entrusted with sensitive cast and talent private information, proprietary content, and critical personal matters. Her credibility and reputation are central to her roles as a Director and Producer, making her vulnerable to any defamatory actions that could jeopardize her career.

159. Defendant knowingly engaged in egregious conduct by creating and disseminating derogatory websites and false narratives to Jane Doe's sales agents, distributors, and business associates, falsely branding her as an "attempted murderer, dangerous, thief, and fraudster." Defendant was fully aware that these malicious fabrications would severely undermine Jane Doe's ability to retain her current roles and pursue new opportunities, acting with explicit intent to harm her professional prospects.

160. As a direct and proximate result of Defendant's intentional interference and defamatory actions, Jane Doe has sustained significant damages, including but not limited to loss of income, diminished professional opportunities, and irreparable harm to her reputation within the industry. This interference has not only affected her current projects but has also created an ongoing chilling effect on her ability to secure future work.

161. The defamatory statements made by Defendant were not only false but were made with a reckless disregard for the truth, further amplifying the damage caused to Jane Doe's professional standing and mental well-being.

162. Jane Doe demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to fully compensate her for her severe injuries and to reflect the significant impact of Defendant's actions on her career.

163. Additionally, Jane Doe seeks punitive damages to punish Defendant for his willful, wanton, reckless, and unlawful conduct, which demonstrates a complete and reckless disregard for her rights and livelihood.

164. She further requests interest, attorneys' fees, costs, and disbursements in this action; with the total amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## SIXTH CAUSE OF ACTION

### Forced Labor under 18 U.S.C. § 1589, *et seq*.

### Jane Doe Against Defendant Jonathan Rees aka Greg Ellis

165. Plaintiffs repeat and realleges each and every allegation in all preceding paragraphs as if fully set forth herein.

166. Jane Doe is a victim of Forced Labor as defined under 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

167. Defendant groomed Jane Doe by luring her from Los Angeles to New York under false pretenses to work on *The Respondent*. He coerced her into working long hours—16-hour days, six to seven days a week—while managing his charity, Children and Parents United, all without fair compensation.

168. Defendant manipulated Jane Doe by fostering a false sense of obligation to protect her reputation and the welfare of his staff. When she attempted to leave, he emotionally blackmailed her, claiming personal struggles, including PTSD and potential self-harm, while threatening legal repercussions from investors and crew if she departed.

169. He instilled fear by asserting that her leaving would result in financial ruin for both of them, creating a situation where Jane Doe felt responsible for the success of the production and charity. This was compounded by his misappropriation of funds, which he falsely attributed to her.

170. Jane Doe incurred significant expenses and was misled into being the face of the production, ultimately drawing the ire of investors and board members, which he redirected toward her. He further manipulated her by dangling promises of payment that never materialized, leaving her in a perpetual state of anxiety about her professional future.

171. As a direct result of Defendant's unlawful conduct, Jane Doe has suffered severe physical injuries, emotional distress, humiliation, and economic harm.

172. Jane Doe seeks reasonable attorneys' fees as provided under 18 U.S.C. § 1595(a), along with any other relief the Court deems just and appropriate.

## SEVENTH CAUSE OF ACTION

### Forgery

### Jane Doe Against Defendant Jonathan Rees aka Greg Ellis

173. Plaintiffs repeat and realleges each and every allegation in all preceding paragraphs as if fully set forth herein.

174. Defendant intentionally submitted fraudulent statements and documents on behalf of Jane Doe while committing forgery, presenting these false statements to Law Enforcement in New York State, Los Angeles Superior Court, and Chenango County Court. These documents falsely claimed that statements and affidavits were signed by Jane Doe, all without her consent or knowledge, with the malicious intent to prosecute his ex-girlfriend.

175. By engaging in this egregious conduct, Defendant not only sought to manipulate the legal system but also aimed to destroy Jane Doe's reputation and credibility. His actions constituted a deliberate effort to mislead authorities and undermine Jane Doe's integrity, exposing her to potential criminal liability and severe emotional distress.

176. The fraudulent acts committed by Defendant were not isolated incidents but part of a larger pattern of deceit and manipulation designed to exert control over Jane Doe and further his own agenda, demonstrating a complete disregard for the truth and the law.

177. As a direct and proximate result of Defendant's forgery and unlawful actions, Jane Doe has suffered significant damages, including but not limited to emotional distress, reputational harm, and the burdens associated with navigating the legal ramifications of Defendant's fraudulent conduct.

178. Jane Doe demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to fully compensate her for the severe injuries and damages she has sustained as a result of Defendant's actions.

179. Additionally, Jane Doe seeks punitive damages to punish Defendant for his willful, wanton, reckless, and unlawful conduct, which demonstrates a complete and reckless disregard for her rights and well-being.

180. She further requests interest, attorneys' fees, costs, and disbursements in this action; with the total amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**EIGHTH CAUSE OF ACTION**

**Identity Theft**

**Jane Doe Against Defendant Jonathan Rees aka Greg Ellis**

181. Plaintiffs repeat and realleges each and every allegation in all preceding paragraphs as if fully set forth herein.

182. Defendant intentionally and unlawfully used Jane Doe's identity to submit fraudulent statements and affidavits to Law Enforcement in New York State, Los Angeles Superior Court, and Chenango County Court. By submitting these documents on Jane Doe's behalf without her consent or knowledge, Defendant sought to benefit himself and maliciously

prosecute his ex-girlfriend, demonstrating a blatant disregard for both legal and ethical standards.

183. Compounding this unlawful conduct, Broome Family Court accidentally sent Defendant Jane Doe's intake form, which contained her New York driving license number and social security number. Defendant has exploited this sensitive information to set up unauthorized accounts, cancel Jane Doe's AT&T family phone line, and potentially engage in other malicious acts. This misuse of her personal information not only constitutes identity theft but also poses serious risks for future ramifications, including further financial and reputational harm.

184. This egregious act of identity theft not only violates Jane Doe's personal rights but also places her in a vulnerable position, exposing her to potential criminal liability and reputational damage. Defendant's actions reflect a calculated effort to manipulate the legal system for his own gain, further amplifying the impact of his deceit on Jane Doe's life and career.

185. As a direct and proximate result of Defendant's unlawful actions, Jane Doe has suffered significant damages, including emotional distress, financial losses, and irreparable harm to her professional reputation. The misuse of her identity has created a lasting stigma that jeopardizes her future opportunities within her industry.

186. Jane Doe demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to fully compensate her for the severe injuries and damages she has incurred as a result of Defendant's identity theft.

187. Additionally, Jane Doe seeks punitive damages to hold Defendant accountable for his willful, wanton, reckless, and unlawful conduct, which demonstrates a complete and reckless disregard for her rights, autonomy, and well-being.

188. She further requests interest, attorneys' fees, costs, and disbursements in this action; with the total amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

189. Plaintiffs request permission from the Court to file such additional causes of action as they deem necessary as a result of further investigation and the production of Defendant's discovery responses, ensuring that all violations of Jane Doe's rights are fully addressed.

## **JURY DEMAND**

190. Plaintiffs hereby demand a trial of this action by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant, granting the following relief:

I. An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to fully compensate Plaintiffs for all non-monetary and compensatory damages, including, but not limited to, substantial compensation for their emotional distress, psychological trauma, and the profound impact on their personal and professional lives.

II. Appropriate injunctive relief against Defendant, including a permanent injunction prohibiting Defendant from contacting Jane Doe, John Doe, and their family; engaging in defamation; invading their privacy; unlawfully intruding into Plaintiffs' private affairs; disclosing their private information; publicizing them in a false light; appropriating their names and images for personal gain; and stalking or harassing Plaintiffs and their family. Privacy is a fundamental right that the legal system is designed to protect, and such injunctive relief is necessary to safeguard Plaintiffs from further harm.

III. Comprehensive injunctive relief ordering Defendant to permanently cease using Plaintiffs' private content, including their names on any website now, or in the future, or their name as part of URL's, video and photographic footage of Jane Doe, John Doe, and their family, on Defendant's exclusive websites or in the possession of his third-party enablers. This relief should extend to Defendant and all of his agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, ensuring that none may directly or indirectly cause, enable, facilitate, encourage, promote, or induce the invasion of Plaintiffs' privacy, unlawful intrusion

into their private affairs, disclosure of their private information, doxing, misrepresentation, or any form of stalking or harassment, whether in person, online, or through social media.

IV. An award of punitive damages, along with any applicable penalties and/or liquidated damages, in an amount to be determined at trial, reflecting the egregious nature of Defendant's conduct and serving as a deterrent against similar future actions.

V. Prejudgment interest on all amounts due, ensuring that Plaintiffs are made whole for the time value of their losses.

VI. An award of all costs incurred by Plaintiffs in this action, including, but not limited to, expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by law, recognizing the substantial legal efforts required to seek justice.

VII. Such other and further relief as the Court may deem just and proper, ensuring that all aspects of Plaintiffs' claims are adequately addressed and remedied.

Broome County, New York

Dated: March 21, 2025

Respectfully submitted,

_Jane Doe_

_____

Jane Doe, Pro Se