U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Apr 6 - 2026**

John M. Domurad, Clerk

UNITED STATES DISTRICT COURT

Northern District of New York

6th Judicial Division

| | | |
|---|---|---|
| | ) | |
| JANE DOE, JOHN DOE | ) | |
| | ) | Case No. 3:24-cv-00274 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| | ) | **Response to Motion to Dismiss** |
| JONATHAN REES aka GREG ELLIS | ) | |
| aka JOHNATHAN REES aka JONNY REES | ) | |
| aka JACOB LORENZO | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

### PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.   COMPLIANCE WITH COURT RULES, SERVICE, AND PRELIMINARY STATEMENT

A. Compliance With Judge D'Agostino's Individual Rules

B. Service Was Proper — Defendant Expressly Waived Any Defect

C. Preliminary Statement: Six Points Control This Motion

II.   STRUCTURE OF PLAINTIFFS' SIX REQUESTS

III.   STANDARD OF REVIEW

IV.   THE ATTACHED RULING IS NON-BINDING; THE INDICTMENT CORROBORATES

PLAINTIFFS

A. The Probable Cause Presumption Is Rebutted by Documented Fraud on the Process

B. The Criminal Complaint Fits a Documented Pattern Against Multiple Women

C. The Credibility Attack Runs Both Directions — and Defendant's Runs Considerably Further

D. Defendant Filed Documents About Plaintiff in a Separate Federal Case in This District — Case No. 3:23-cv-01352

V.    SUBJECT MATTER JURISDICTION: ITEMIZED DAMAGES SUBSTANTIALLY EXCEED $75,000

VI.   JOHN DOE IS PROPERLY BEFORE THIS COURT

VII.  DEFENDANT ACTED IN CONCERT WITH VEM MILLER, MARK SKIPPER, AND MICHAEL MALOY

VIII. EACH CAUSE OF ACTION IS PLAUSIBLY PLEADED

A. Defamation Libel Per Se (Leave to Add)

B. Intrusion Upon Seclusion and Public Disclosure of Private Facts (Leave to Add)

C. IIED — Extreme and Outrageous Conduct

D. New York Labor Law §§ 190, 198, and 215 (Leave to Add)

E. Common Law Fraud, Fraudulent Inducement, Unjust Enrichment (Leave to Replead)

F. NYSHRL — § 296-d Controls

G. N.Y. Civil Rights Law § 52-b — Direct Personal Threat

H. Tortious Interference

I. Forced Labor — 18 U.S.C. §§ 1589, 1590, 1595

J. Malicious Prosecution (Leave to Add); Alternative: Abuse of Process

IX.   INJUNCTIVE RELIEF IS THE ONLY ADEQUATE REMEDY — CHILDREN REQUIRE PROTECTION

IX.B. PREEMPTIVE RESPONSES TO ANTICIPATED REPLY ARGUMENTS

7. Prior Pleading Errors Do Not Defeat Well-Pleaded Claims

8. Weaknesses Identified in Vacatur Order Are Addressed in the SAC

9. Defendant's Declaration Contains Statements This Court Has Already Found Inconsistent With the Record

X.    CONCLUSION — THIS CASE MUST BE HEARD ON THE MERITS

A. This Court Gave Defendant a Second Chance. The Record Warrants Proceeding to Discovery.

B. Plaintiffs Have Complied. The Documents Now Confirm the Truth.

C. Discovery Will Establish the Full Truth

D. Plaintiffs Ask for Their Chance to be Heard — This Court Gave Defendant His Second

**TABLE OF AUTHORITIES**

**CASES**

*Adia v. Grandeur Mgmt. Inc.*, 933 F.3d 84 (2d Cir. 2019)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008)

*Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238 (1943)

*Brown v. Cty. of Madison*, 2015 WL 5750050 (N.D.N.Y. 2015)

*Cantalino v. Danner*, 96 N.Y.2d 391 (2001)

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004)

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163 (2d Cir. 2000)

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)

*Coleman v. Grand*, No. 21-800 (2d Cir. Nov. 3, 2025)

*Colon v. City of New York*, 60 N.Y.2d 78 (1983)

*Corsello v. Verizon N.Y.*, 18 N.Y.3d 777 (2012)

*Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000)

*Curiano v. Suozzi*, 63 N.Y.2d 113 (1984)

*Doe v. Guthrie Clinic*, 710 F.3d 492 (2d Cir. 2013)

*Doe v. Rees, No. 3:25-cv-00133-DRL-SJF (N.D. Ind. Mar. 18, 2026) (Exhibit Y)*

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009)

*Firth v. State*, 98 N.Y.2d 365 (2002)

3

*Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2d Cir. 2018)

*Foman v. Davis*, 371 U.S. 178 (1962)

*Freihofer v. Hearst Corp.*, 65 N.Y.2d 135 (1985)

*Gallagher v. Miller II (N.D.N.Y. 2025)*

*Glob. Network Commc'ns v. City of New York*, 458 F.3d 150 (2d Cir. 2006)

*Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980)

*Henneberry v. Sumitomo Corp.*, 415 F. Supp. 2d 423 (S.D.N.Y. 2006)

*Howell v. N.Y. Post Co.*, 81 N.Y.2d 115 (1993)

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012)

*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013)

*Johns v. Cnty. of San Diego*, 114 F.3d 874 (9th Cir. 1997)

*Kashi v. Gratsos*, 790 F.2d 1050 (2d Cir. 1986)

*Koch v. Christie's Int'l PLC*, 699 F.3d 141 (2d Cir. 2012)

*Kontrick v. Ryan*, 540 U.S. 443 (2004)

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991)

*Kreisler v. Second Avenue Diner Corp.*, 731 F.3d 184 (2d Cir. 2013)

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413 (1996)

*Liberman v. Gelstein*, 80 N.Y.2d 429 (1992)

*Manway Constr. Co. v. Hous. Auth.*, 711 F.2d 501 (2d Cir. 1983)

*Mira v. Harder*, 177 A.D.3d 426 (1st Dep't 2019)

Morgan v. Luft, No. 9:15-CV-0024, 2016 WL 1118452, at *3 (N.D.N.Y. Mar. 22, 2016) (Suddaby, C.J.)

*Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293 (1983)

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997)

*Nader v. General Motors Corp.*, 25 N.Y.2d 560 (1970)

*Nelson v. Ulster County*, 789 F. Supp. 2d 345 (N.D.N.Y. 2010)

*New Hampshire v. Maine*, 532 U.S. 742 (2001)

*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998)

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)

*Pyskaty v. Wide World of Cars*, 856 F.3d 216 (2d Cir. 2017)

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)

*Rippo v. Baker*, 580 U.S. 285 (2017)

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010)

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003)

*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2d Cir. 2008)

*Seltzer v. Bayer*, 272 A.D.2d 263 (1st Dep't 2000)

*Shidagis v. Broome Cnty. D.S.S.*, No. 3:23-CV-0031, 2023 WL 198143 (N.D.N.Y. Jan. 17, 2023)

*Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952)

*Stern v. Regency Towers, LLC*, 886 F. Supp. 2d 317 (S.D.N.Y. 2012)

*Tom Doherty Assocs. v. Saban Entertainment*, 60 F.3d 27 (2d Cir. 1995)

*Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010)

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006)

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008)

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011)

*Valdez v. United States*, 518 F.3d 173 (2d Cir. 2008)

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001)

**STATUTES AND RULES**

18 U.S.C. §§ 1589, 1590, 1595 (Forced Labor / Civil Remedy)

28 U.S.C. § 1332 (Diversity Jurisdiction)

28 U.S.C. § 1367 (Supplemental Jurisdiction)

Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 65(d)(2)(C) (Injunction Binding Non-Parties)

Fed. R. Evid. 201(b)(2) (Judicial Notice)

Fed. R. Evid. 404(b) (Other Acts Evidence)

Fed. R. Evid. 801(d)(2) (Party Admissions)

N.Y. Civ. Rights Law § 52-b (Unlawful Dissemination of Intimate Image)

N.Y. Civ. Rights Law § 76-a (Anti-SLAPP)

N.Y. CPLR § 6301 (Prejudgment Asset Restraint)

N.Y. Exec. Law § 296-d (NYSHRL — Non-Employees)

N.Y. Lab. Law §§ 190, 198(1-a), 215 (Wages, Liquidated Damages, Retaliation)

N.Y. Penal Law § 135.00(1) (Unlawful Restraint)

N.Y. Penal Law § 175.35(1) (Offering a False Instrument for Filing)

N.Y. Penal Law § 250.45(1) (Unlawful Surveillance)

N.D.N.Y. L.R. 7.1 (Motion Practice)

22 NYCRR § 100.3(E)(1)(a) (Judicial Recusal)

CPL § 30.30 (Speedy Trial)

CPL § 530.12(3-a) (Local Criminal Court Temporary OOP Authority)

## I. COMPLIANCE WITH COURT RULES, SERVICE, AND PRELIMINARY STATEMENT

### A. Compliance With Judge D'Agostino's Individual Rules

Jane Doe and John Doe submit this joint memorandum in compliance with the Individual Rules of Hon. Mae A. D'Agostino, § 2(C)(ii) and § 2(C)(i). Defendant's Memorandum (Doc. 103-3) totals 32 pages, which may exceed the limit under N.D.N.Y. L.R. 7.1(a)(1). *Brown v. Cty. of Madison*, 2015 WL 5750050, at *1 (N.D.N.Y. 2015).

### B. Service Was Proper — Defendant Expressly Waived Any Defect

Defendant's brief states: "If the Court finds that Plaintiff's purported service did not comply with the Court's March 9 Order, Mr. Rees hereby waives any such defect in service." Doc. 103-3 at 3. *Kontrick v. Ryan*, 540 U.S. 443, 458 (2004); *Manway Constr. Co. v. Hous. Auth.*, 711 F.2d 501, 503 (2d Cir. 1983). Defendant's own counsel confirmed receipt: "On March 26, 2026, Jane Doe emailed the Second Amended Complaint to Mr. Rees' new counsel." Hugel Decl. ¶ 2.

6

**C. Preliminary Statement: The Documentary Record Corroborates Every Material Allegation**

Six points control this motion and are addressed in full below. **First**, Defendant's own production budget — prepared using industry-standard Entertainment Partners Budgeting software — names Plaintiff by name at $286,369 in total compensation. She was paid nothing. A defendant cannot declare that no production existed while his own financial planning document names the plaintiff at specific professional rates. **Second**, a nine-count Chenango County grand jury indictment found probable cause that Defendant committed perjury, filed false instruments, conducted unlawful surveillance, coerced through threats to release intimate images, and disseminated intimate images — the identical mechanisms Plaintiff alleges, at the same property, during the same period, against a different victim. **Third**, Defendant argued before this Court that this case should be heard on its merits in order to vacate the default this Court found willful. Having obtained that relief on that basis, he cannot now argue for dismissal before the merits are examined. **Fourth**, Defendant filed documents about Plaintiff — a non-party — in his ex-girlfriend's federal lawsuit nine times over fifteen months. Plaintiff had no standing to appear in that proceeding and no ability to respond to what was filed about her there. Within her order in that case, Hon. Judge Elisabeth Coombs found it necessary to direct that harassment must stop. A non-party cannot defend herself in a proceeding where she has no standing. That is precisely why the conduct belongs before this Court. **Fifth**, on March 18, 2026, a federal district judge in the Northern District of Indiana, after an evidentiary hearing at which Defendant testified under oath, found that significant portions of his sworn statements could not be credited, that his claimed transient lifestyle was implausible and a deliberate stratagem, and that he was unusually evasive when questioned about his residence and activities. That independent judicial credibility finding — made after live testimony and cross-examination by a second federal judge — is directly relevant to Defendant's attempt to use his own unproven criminal complaint to discredit Plaintiff's allegations before this Court. **Sixth**, on February 17, 2026, the New York State Commission on Judicial Conduct issued a formal determination recommending removal of

7

Justice Jordon R. Lilley — the Smithville Town Court justice who issued the void ex parte Order of Protection against Plaintiff. The Commission found, with specific documentary evidence: that Justice Lilley and Defendant exchanged numerous phone calls and emails while Plaintiff's criminal case was pending before him, including calls on the same day he issued OOPs against Plaintiff and calls timed to events in the Commission's own investigation (CJC Det. ¶22); that Justice Lilley forwarded Plaintiff's own emails to Defendant while the case was pending, including Plaintiff's application to the court and her public defender denial (CJC Det. ¶23); that Justice Lilley testified falsely under oath that he had never emailed Defendant, saying "I've never emailed Greg Ellis" (CJC Det. ¶29); that after being ordered to preserve evidence he deleted over 500 judicial emails four days later — the first day he held court after testifying (CJC Det. ¶35); and that the retrieved deleted emails contained the very emails he denied sending (CJC Det. ¶36). The Commission's formal findings are not allegation. They are a published determination by New York State's independent judicial oversight body confirming, with retrieved documentary evidence, that the judge who presided over Plaintiff's criminal case was in direct communication with Defendant during those proceedings, lied about it under oath, and tried to destroy the proof. Taken together, these six points reflect a documentary record that is unusual at the pleading stage in both its depth and its independence. The first five points draw on Defendant's own financial documents, a grand jury's independent findings, Defendant's own prior litigation conduct, a federal docket in this District, and a second federal court's credibility findings after live testimony. The sixth point goes further. The New York State Commission on Judicial Conduct's February 17, 2026 Determination sustaining all charges against Justice Jordon R. Lilley — the justice who issued the void OOP against Plaintiff at Defendant's request — provides official, independent corroboration of the corrupted legal process Plaintiff alleges. The Commission found, with retrieved documentary evidence, that the judge who presided over Plaintiff's criminal case was in direct ex parte communication with the complainant against her, forwarded her private court filings to him, lied about it under oath, and tried to destroy the proof. Those findings do not merely corroborate one claim. They establish that Defendant's credibility

8

attack — his attempt to use the pending criminal case to discredit Plaintiff's allegations — relies on a proceeding now confirmed by a state constitutional agency to have been compromised from its inception. The credibility attack runs both directions. Exhibit Z. Each of these six points independently supports denial of this motion. Together, they establish that the allegations in the Second Amended Complaint are not merely plausible — they are corroborated by Defendant's own documents, a grand jury's findings, Defendant's own prior arguments to this Court, a federal judicial record in this District, a second federal judge's credibility findings made after live testimony, and a New York State judicial oversight body's published determination. Plaintiffs' allegations are corroborated by a documentary record that includes the production's own financial planning documents:

- **ECF 71-15, pages 51, 52 — EP Budget (Entertainment Partners Budgeting Software):** The official production budget prepared using Entertainment Partners Budgeting software, naming Plaintiff — **"JANE DOE, OTHER TBA" as producer at $60,000 and as "JANE DOE DGA RATE" as director at $226,369 net — $286,369 total in the production's own financial planning document, at the DGA rate, prepared using industry-standard software. She was paid nothing. Full detail in the damages table at Section V.**

- **Exhibit R — Production Office Lease Agreement (December 2, 2022):** Signed by Defendant as both lessor (Jonathan Rees, The Respondent LLC) and lessee (Greg Ellis, Wolfcrow) on the same instrument. He was both contracting parties to his own production office lease using two different identities.

- **Exhibit S — Email: Jane Doe to Ben Smith CPA and Doug Ansell (February 2, 2023):** Plaintiff's own real-time business email to the investor's accountant: "I'm the producer on record for both these doc series given I run the business side of the productions." Coordinating $100,000 in investor K1 filings while receiving no compensation.

- **Exhibit T — Text messages with Doug Ansell (January 31, 2023):** Ansell asks Plaintiff which LLC holds his investment because his accountant is asking. Plaintiff identifies the investment vehicles, confirms Ansell is Executive Producer of both series, and references a prior separate $100,000 Ansell investment to Monkey Toes LLC for a feature film "way before my time."

- **Exhibits BB, CC, DD and ECF 71-12 (indictment):** Defendant's own emails documenting private prosecutorial coordination; traffic ticket destroying the flight narrative; nine-count grand jury indictment establishing that the specific mechanisms alleged here — perjury, false filings, coercion, and surveillance at this property during this period — have already been found sufficiently credible to support criminal charges against Defendant in the same county.

- **Exhibit V — Email from Aaron Dean, Esq. (December 21, 2024):** Plaintiffs have received written communication from criminal defense counsel in the Chenango County proceedings confirming that counsel personally observed, during formal review of criminal discovery materials, a bank of monitors at Defendant's property displaying camera feeds explicitly labeled for private spaces within the residence. This written communication is protected by the attorney-client privilege and work product doctrine. Plaintiffs do not attach it at this stage and make no waiver of applicable privilege. Plaintiffs are prepared to submit this communication for in camera review, pursuant to a separate motion filed herewith, so that the Court may assess its relevance to the intrusion upon seclusion and N.Y. Civil Rights Law § 52-b claims before ruling on this motion to dismiss. This communication constitutes direct professional eyewitness corroboration, from inside the criminal discovery process, that the surveillance infrastructure Plaintiff describes existed and was configured to monitor the precise private spaces at issue in this case.

10

This Court has already found Defendant's 18-month default **willful**. ECF No. 97 at 12. Dismissal at this stage would require the Court to weigh competing factual narratives, which is impermissible under Rule 12(b)(6). The motion should be denied.

## II. STRUCTURE OF PLAINTIFFS' SIX REQUESTS

Plaintiffs make six distinct requests, each operating independently:

- **Primary:** Deny the motion in its entirety.

- **Replead Seventh and Eighth Causes of Action:** Leave to replead as fraud, fraudulent inducement, and unjust enrichment if dismissed. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

- **Add standalone defamation libel per se:** Factual basis fully pleaded throughout the SAC.

- **Add standalone intrusion upon seclusion and public disclosure of private facts:** Named and pleaded at SAC ¶¶ 54, 104, 147, 574–576, 663–664, 715–719, 724–727, 845–848, 853–862, 871, 877–898, 902–910.

- **Add standalone malicious prosecution and NYLL §§ 190 and 215:** All elements pleaded throughout the SAC. Non-payment of wages documented in the production's own budget naming Plaintiff with specific figures.

- **John Doe adoption:** Accept the accompanying Declaration of John Doe.

## III. STANDARD OF REVIEW

A complaint survives Rule 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All factual allegations accepted as true; all reasonable inferences favor Plaintiffs. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Defendant's declarations present factual disputes for discovery. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Pro se pleadings receive special solicitude. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d

Cir. 2006); *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

"On a motion to dismiss for failure to state a claim the Court may consider statements in a pro se plaintiff's response as effectively amending the allegations in her operative complaint to the extent those statements are (as here) consistent with those allegations." Morgan v. Luft, No. 9:15-CV-0024, 2016 WL 1118452, at *3 (N.D.N.Y. Mar. 22, 2016) (Suddaby, C.J.).

## IV. THE ATTACHED RULING IS NON-BINDING; THE INDICTMENT CORROBORATES PLAINTIFFS

The Chenango County Decision & Order (Doc. 103-1) is a pre-hearing suppression ruling with zero preclusive effect. *Stern v. Regency Towers, LLC*, 886 F. Supp. 2d 317, 323 (S.D.N.Y. 2012). The nine-count grand jury indictment (ECF 71-12) is not offered for the truth of the matters asserted in the criminal proceeding, and is not offered to show propensity. It is offered as corroborative context admissible under Fed. R. Evid. 404(b) to show that the specific mechanisms alleged here — perjury, false filings, surveillance, and coercion deployed against a victim at this property during this period — have already been found sufficiently credible by a grand jury to support criminal charges, demonstrating pattern, plan, and absence of mistake. *Glob. Network Commc'ns v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). Count 4 (unlawful webcam surveillance at Defendant's property) and Count 9 (intimate image dissemination of another victim) directly corroborate the bedroom/bathroom surveillance allegations. Counts 1–3 (perjury, false instruments, false written statements) corroborate the fabricated prosecution and fraud. Counts 5–7 (coercion) corroborate the forced labor scheme.

### A. The Probable Cause Presumption Is Rebutted by Documented Fraud on the Process.

Defendant will argue in reply that the criminal complaint against Plaintiff creates a presumption of probable cause that defeats the malicious prosecution claim. See *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). That presumption is rebuttable — and Plaintiffs have rebutted it. Under New York law, the probable cause presumption arising from a criminal complaint is overcome where the plaintiff alleges that the complaint was procured through fraud, perjury, or the suppression of evidence. *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983); *Ricciuti v.*

12

*N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (probable cause presumption rebutted by allegation that officer fabricated evidence). Plaintiffs allege precisely that. On August 8, 2023 — the same day Defendant filed the criminal complaint and while Plaintiff was being interviewed by Sgt. Chad O'Hara — Defendant sent a video to Plaintiff's former management team bearing the heading "attempted murder" and accompanied by sinister background music (71-15 page 54). Within a couple of weeks thereafter, Defendant launched two defamatory websites ending .com and .info that prominently featured the identical video on their home pages. On August 19th, 2023, a mere eleven days later, Defendant had changed his account materially, now claiming three accomplices in black clad clothing (Exhibit BB). His own emails document a private cooperative relationship with the prosecuting ADA that was withheld from Plaintiff as Brady/Giglio material for nearly two years (Exhibit BB, CC). His own traffic ticket places him in New York at 98 MPH ten days after he claimed to have fled the state in fear (Exhibit CC). Even if a presumption of probable cause arose from the complaint, Plaintiffs have alleged specific, documented facts sufficient to rebut it at the pleading stage. Dismissal at this stage would require the Court to weigh competing factual narratives, which is impermissible under Rule 12(b)(6).

**B. The Criminal Complaint Against Plaintiff Fits a Documented Pattern Against Multiple Women.** Defendant filed his criminal complaint against Plaintiff on August 8, 2023. Approximately one year later — nearly to the day — a Chenango County grand jury indicted Defendant on nine counts arising from his conduct against a different victim at the same property during the same period, including perjury (P.L. § 210.05), offering a false instrument for filing (P.L. § 175.35(1)), making a false written statement (P.L. § 210.45), unlawful webcam surveillance (P.L. § 250.45(1)), three counts of coercion (P.L. §§ 135.60(3)(5)(9)), aggravated harassment, and unlawful dissemination of an intimate image. The specific mechanisms charged — perjury, false filings, surveillance, and coercion — are identical to the specific mechanisms Plaintiff alleges were deployed against her at the same property during the same period. Plaintiffs do not offer the indictment for propensity purposes. They offer it as corroborative context

13

demonstrating that the specific mechanisms alleged here — perjury, false filings, surveillance, and coercion — have already been found sufficiently credible by a grand jury to support criminal charges arising from the same setting and the same time period. A grand jury's finding of probable cause that this specific system of conduct existed and was applied against at least one other victim further supports plausibility of Plaintiffs' identical allegations under Fed. R. Evid. 404(b) and *Iqbal*'s plausibility standard. Even if an indictment of Plaintiff existed, Plaintiffs have plausibly alleged it was procured through the same improper conduct — perjury, false instruments, and suppression of exculpatory material — for which Defendant himself was indicted in the same county. The accompanying Declaration of Dana Rees (Exhibit W), Defendant's former spouse, further corroborates the existence of this repeatable system of conduct. Ms. Rees describes the identical mechanism deployed against her: false public accusations through Defendant's publication "The Respondent"; manipulation of legal process through false filings; and written threats against a third-party family who reported Defendant to Lakeside Country Club for aggressive sexual misconduct towards their daughter— threats documented on six index cards submitted by Ms. Rees to a California court in restraining order proceedings and authenticated in her declaration. The nine-count Chenango County indictment independently corroborates the identical mechanism of false filings, covert surveillance, intimate image threats, and coercion in a parallel proceeding involving a different victim at the same property during the same period — the same conduct for which a grand jury found probable cause. This pattern is further corroborated by the People's Response to Defendant's Pre-Trial Omnibus Motions (Exhibit DD) filed in the pending Chenango County criminal case against Defendant, People v. Jonathon Rees, Ind. No. 70260-24 (Chenango County District Attorney's Office, July 18, 2025). In that filing, the prosecution details Defendant's use of the identical tactics alleged here: filing false written instruments with courts, manipulating email correspondence to create a false narrative, unlawful surveillance and recording of intimate acts, and coercion through threats to disseminate intimate images and ruin the victim's reputation. These allegations arise from conduct against a different victim during the same general time

period as the events at issue in this action. The Chenango County filing is a public court record subject to judicial notice under Fed. R. Evid. 201(b)(2) and is offered solely for the non-propensity purposes permitted by Fed. R. Evid. 404(b) — to show pattern, plan, intent, and absence of mistake. Defendant's publication "The Respondent" is not offered for propensity purposes, but as corroborative evidence under Fed. R. Evid. 404(b) of intent, plan, and absence of mistake — specifically, Defendant's documented practice of publicly deploying false factual accusations against intimate partners who initiate or participate in legal proceedings against him. Two independent declarants. A nine-count grand jury indictment. One documented system of conduct across multiple relationships and multiple years. This is a repeatable method. It is not a one-off dispute.

**C. The Credibility Attack Runs Both Directions — and Defendant's Runs Considerably Further.** Defendant may argue that the existence of a criminal complaint against Plaintiff renders her allegations unreliable or self-serving. This argument cannot survive scrutiny. The complaint was filed by Defendant himself — the same Defendant whose emails document a private cooperative relationship with the prosecuting ADA withheld for almost two years; whose narrative changed materially within eleven days of filing his complaint; who was driving at 98 MPH in New York ten days after he claimed to have fled the state; who signed both sides of his own production office lease under two different names; and who was himself indicted nearly one year later for perjury and filing false instruments in the same county using identical methodology with a different woman. **The credibility of the criminal complaint against Plaintiff is inseparable from the credibility of the man who made it**. At the pleading stage, the Court accepts Plaintiff's allegations as true. The documentary record — Defendant's own documents — supports those allegations as more than plausible; they are corroborated. Defendant's credibility arguments are particularly unpersuasive in light of the grand jury's finding of probable cause that he engaged in the very pattern of surveillance, threats to release intimate images, and false statements to courts that Plaintiffs allege here — against a different victim, at the same

15

property, during the same time period. That finding, made by a grand jury applying the probable cause standard to evidence presented by the People of New York, is not offered to establish Defendant's guilt. It is offered because a complainant who has himself been found by a grand jury to have probably engaged in perjury, false filings, coercive surveillance threats, and unlawful dissemination of intimate images against another person in the same setting cannot credibly invoke his own unproven criminal complaint as a basis for dismissing a civil plaintiff's parallel allegations of identical conduct. The credibility concern extends beyond this District and beyond the Chenango County proceedings. On March 18, 2026 — two weeks before this opposition was filed — a federal district judge in the Northern District of Indiana, the Honorable Damon R. Leichtman, issued a 35-page Opinion and Order in Case No. 3:25-cv-00133-DRL-SJF after conducting an evidentiary hearing at which Defendant testified under oath and was subject to cross-examination. See Exhibit Y (Opinion and Order, *Doe v. Rees*, No. 3:25-cv-00133-DRL-SJF (N.D. Ind. Mar. 18, 2026)). Plaintiffs offer this order not for propensity purposes, but under Fed. R. Evid. 201(b)(2) for judicial notice as a public federal court record, and under Fed. R. Evid. 404(b) to show a documented pattern of evasive conduct, false sworn statements, and strategic post-hoc manipulation of the factual record across multiple federal proceedings. Judge Leichtman found, after hearing Defendant testify and observing his demeanor, that significant portions of his sworn statements could not be credited. The court found his claimed transient lifestyle to be implausible and characterized it as more a deliberate stratagem than genuine circumstance. The court further found Defendant unusually evasive when questioned about his addresses, his residence, and his activities — describing the process of extracting answers from him as like pulling a stubborn molar. Exhibit Y at 2, 27. In assessing his overall credibility on key disputed facts, the Indiana court stated it "credits him not one iota." Id. at 27. The court went further, finding evidence of what it described as a real effort by Defendant to retroactively sever his documented connection to a property after service was effected and after a default judgment was entered — specifically to inoculate his connection to that property against the legal proceedings. Id. at 28. The court also found that Defendant had submitted an affidavit swearing

he was not a member of a country club — a statement that became technically true only four days before he signed it, after a documented history of membership and billing to the same property, and that omitted that entire history. Id. The Indiana court also addressed a specific and significant instance of documentary inconsistency. **The plaintiff in that case subpoenaed the country club directly and received official account statements accompanied by a sworn custodial affidavit. Defendant produced what he claimed were his own copies of the same statements. The two sets differed materially — in addresses, personnel listed, and monthly totals. Rather than explain the discrepancy or acknowledge error, Defendant asserted that the documents produced by the country club under subpoena must have been changed or tampered with by someone acting against him.** The Indiana court rejected this entirely. Faced with a choice between records produced by an independent party under subpoena with a sworn custodial affidavit and records offered by Defendant himself, the court chose the independent party and characterized Defendant's submission of his own version as nothing more than another effort to overwork the facts, thereby undermining his credibility. Exhibit Y at 28–29. This pattern of concealment is consistent with the Indiana court's finding that Defendant uses layered entities and nominee structures to shield assets and evade legal process (Exhibit Y at 3–6). This finding is directly relevant to this action. The pattern the Indiana court observed — producing a competing version of objective documentary evidence and then suggesting the independently obtained version was tampered with — is the same methodology Plaintiff alleges here: a criminal complaint filed the same day attempted murder videos went out, two weeks later two defamatory website launches, a narrative that changed materially within eleven days, and private prosecutorial communications withheld for nearly two years as Brady/Giglio material. These are not findings of confusion or imprecision. They are judicial findings of deliberate, strategic manipulation of sworn statements and documentary evidence to defeat legal proceedings — the same conduct Plaintiff alleges throughout the Second Amended Complaint. A defendant who has been found by a second federal judge, after live cross-examination, to have repeatedly overworked the facts and manufactured competing documentary narratives when confronted with

objective evidence cannot ask this Court to credit his sworn statements and narrative over Plaintiff's documented allegations at the Rule 12(b)(6) stage. The Indiana court's findings extend further, and the court's own language warrants attention. Judge Leichtman wrote that Defendant *"followed a similar modus operandi here as he has before"* — specifically documenting that Defendant told this Court on December 6, 2024 that he lived a nomadic existence with no fixed abode, then provided a firm address to a different judge in a different proceeding approximately two weeks later. Exhibit Y at 30. The use of the phrase "modus operandi" by a federal judge is not casual. It is the language of pattern — a characteristic method of operation applied repeatedly across proceedings. It maps precisely onto the standard for admission under Fed. R. Evid. 404(b): not propensity, but a documented method that makes the conduct alleged here more plausible, not less. December 6, 2024 is also the date of ECF 82 in Case No. 3:23-cv-01352 — one of the nine filings Defendant made about Plaintiff, a non-party, in his ex-girlfriend's federal case. On the very day he filed documents about Plaintiff in another woman's lawsuit, he was simultaneously representing to this Court that he had no fixed abode. The Indiana court's findings also document the structural architecture Defendant uses to conceal assets and identity across proceedings. Defendant held his Indiana property through an offshore Cook Islands trust — Southpac Trust International, Inc. — a company the Indiana court identified as specifically marketed for high-risk professionals seeking creditor protection and privacy, including pre-litigation asset shielding. Exhibit Y at 3–4. He registered his Tesla to a Wyoming LLC called Morf — organized through a registered agent with no member information — specifically, in his own testimony, to be as private and confidential as possible, while continuing to use the vehicle exclusively as his own. Id. at 5–6. He directed utilities for the property to be placed in his fiancée's name specifically, in his own words, to keep his name off any public record. Id. at 5. Taken together, these are not isolated acts of privacy. They are a documented system of layered entities, nominee names, and offshore structures deployed to make Defendant's assets, location, and activities difficult to trace or attach through legal proceedings. This is the same structural methodology Plaintiff alleges in the Second Amended Complaint — multiple LLCs, multiple

18

names, and coordinated misdirection — applied to the production that forms the basis of the wage, forced labor and fraud claims here. Finally, the Indiana court noted that Defendant claimed to have kept written notes of every time he visited Indiana and every overnight stay, yet never produced those notes at the evidentiary hearing despite their obvious materiality to the central issue before the court. Id. at 14. A person who maintains meticulous records of his own movements and withholds them when ordered to account for those movements in litigation is engaged in the same deliberate concealment that Plaintiff alleges here. The Indiana record, in its totality, does not merely corroborate Plaintiff's credibility arguments. It provides independent judicial documentation — after live testimony, cross-examination, subpoenaed records, and body camera footage — that Defendant operates through a consistent and identifiable pattern: offshore structures to shield assets, nominee identities to conceal location, technically accurate present-tense statements to hide past conduct, competing documents to attack independent evidence, and a transient narrative deployed selectively depending on which court is asking the question. That pattern is now corroborated by a third independent judicial body. On February 17, 2026, the New York State Commission on Judicial Conduct sustained all four charges against the Smithville Town Justice who issued the void OOP against Plaintiff, finding that he engaged in extensive ex parte communications and email forwarding with Defendant while Plaintiff's criminal case was pending before him, testified falsely under oath denying those contacts, and deleted over 500 judicial emails after a preservation order — the very emails the Commission later recovered and found contained the communications he had just denied. Exhibit Z. Three independent judicial bodies — a federal court in Indiana, this Court in its March 9, 2026 order, and the New York State Commission on Judicial Conduct — have each, from their own proceedings and their own evidence, arrived at findings that corroborate the pattern of conduct Plaintiff alleges throughout the Second Amended Complaint.

**D. Defendant Filed Documents About Plaintiff in a Separate Federal Case in This District — Case No. 3:23-cv-01352 (N.D.N.Y.).** The pattern of using legal proceedings as instruments of

19

attack against Plaintiff is not limited to this case or to the Chenango County criminal proceedings. In Case No. 3:23-cv-01352, a separate civil action pending in this District before Judge Elisabeth Coombs involving Defendant's ex-girlfriend, Defendant filed documents specifically referencing or concerning Plaintiff Jane Doe on at least nine separate occasions spanning fifteen months. Plaintiffs do not seek to merge, consolidate, or affect Case No. 3:23-cv-01352 in any way. That case is wholly separate and involves a different plaintiff. Plaintiffs seek only judicial notice, pursuant to Fed. R. Evid. 201(b)(2), of the existence of specific docket entries in that case as evidence of a documented cross-proceeding pattern under Fed. R. Evid. 404(b). The nine filings are: (1) June 3, 2024, ECF 71-15, Exhibit 26 (transcript exhibit); (2) June 17, 2024, ECF 37 and ECF 37-1; (3) December 6, 2024, ECF 82; (4) December 8, 2024, ECF 78; (5) December 10, 2024, ECF 84, ECF 84-2, ECF 84-3, and ECF 84-4 (four-part filing); (6) August 27, 2025, ECF 110; (7) August 27, 2025, ECF 112; (8) August 28, 2025, ECF 113; and (9) September 3, 2025, transcript. See Exhibit X. The December 10, 2024 cluster of filings carries particular significance. This Court's own March 9, 2026 Memorandum-Decision and Order found that those filings specifically referenced this action, and that within that submission Defendant referred to the Roscoe Street address — the same address he subsequently swore under penalty of perjury he had never visited — as his "confidential address." ECF No. 97 at 8. This Court expressly cited the December 10, 2024 filings as proof that Defendant was aware of this action "sometime before December 10, 2024." Id. The December 10, 2024 filings in Case No. 3:23-cv-01352 are therefore simultaneously: (a) evidence of the non-party harassment pattern; (b) proof of Defendant's knowledge of this action nine months before he claimed to have only recently learned of it; and (c) the source of a false sworn statement Defendant subsequently made to this Court about his own address and lack of knowledge of this lawsuit. The significance of these filings is not their frequency. It is the complete absence of any legitimate procedural basis for them. Plaintiff Jane Doe is a non-party to Case No. 3:23-cv-01352. She had no standing to appear in that proceeding, no ability to respond to documents filed about her there, and no mechanism to contest or correct anything Defendant said about her on that docket. Defendant

had no legitimate litigation reason to be filing documents about a non-party in his ex-girlfriend's federal lawsuit. Each filing was not ordinary litigation conduct — it was the deliberate exploitation of a federal judicial docket as a vehicle to attack someone who had no ability to respond in that forum. That is what distinguishes this conduct from incidental cross-referencing: the forum choice was itself the weapon. Plaintiffs respectfully request that this Court take judicial notice of the existence of these docket entries pursuant to Fed. R. Evid. 201(b)(2), as each is capable of accurate and ready determination from the PACER public access system. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (courts may take judicial notice of proceedings in other courts). The legal significance of the cross-case filings is fourfold. **First,** it establishes that Defendant is using this District's federal docket as an additional instrument of attack against Plaintiff Jane Doe across multiple simultaneous proceedings — filing documents about a non-party in another woman's case while refusing to defend against her claims in his own. **Second**, the Smithville OOP filed in that case is a void instrument that has since been vacated by a court of competent jurisdiction. Plaintiff was the criminal defendant in the Smithville proceeding on Rees's complaint — not a witness. After the case transferred to Chenango County Court before Hon. Judge Revoir, Defendant returned ex-parte to Justice Lilley and obtained a three-year OOP against Plaintiff, despite the case having transferred out of Justice Lilley's court entirely. Plaintiff discovered the order when Defendant published it on social media and filed it in Case No. 3:23-cv-01352. Plaintiff transmitted the order to her criminal defense counsel Aaron Dean, Esq., who brought it to Judge Revoir's attention. Judge Revoir vacated the Smithville OOP. That vacation by the court of competent jurisdiction constitutes a judicial determination of the order's invalidity and the favorable termination required for malicious prosecution. Every filing of the void order in Case No. 3:23-cv-01352 after Judge Revoir's vacation was the knowing filing of a judicially invalidated order in a federal proceeding — the same conduct for which Defendant was indicted in Chenango County under P.L. § 175.35(1). **Third**, within her order vacating the entry of default against Defendant in Case No. 3:23-cv-01352 (ECF No. [X]), Judge Coombs found it necessary to direct that the harassment

21

must stop. Plaintiffs do not overread that finding — it was made in the context of a vacatur ruling, not a harassment adjudication. But a federal judge in this District, presiding over a case in which Defendant was simultaneously filing documents about a non-party across nine occasions, independently found conduct in that proceeding serious enough to address with a judicial directive. That finding is itself judicially noticeable under Fed. R. Evid. 201(b)(2) as a public court order in a proceeding before this District. **Fourth**, the filing of documents about Plaintiff in Case No. 3:23-cv-01352 is an additional instance of the documented cross-proceeding pattern. Plaintiff Jane Doe is a non-party to that case. She had no standing to appear, no ability to respond to what was filed about her there, and no mechanism to correct the record in that forum. A non-party cannot defend herself in a proceeding where she has no standing. That is precisely why the conduct belongs before this Court on the merits.

## V. SUBJECT MATTER JURISDICTION: ITEMIZED DAMAGES SUBSTANTIALLY EXCEED $75,000

The following damages table is now supported by four contemporaneous documentary exhibits. Good-faith damages allegation controls. *Pyskaty v. Wide World of Cars*, 856 F.3d 216, 222 (2d Cir. 2017). Punitive damages may be included. *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943).

| CATEGORY OF DAMAGE | AMOUNT | DOCUMENTARY BASIS |
| --- | --- | --- |
| Camera gear, lenses, production equipment (damaged) | $30,000+ | SAC ¶ 66 |
| iMac and MacBooks (damaged) | $8,000–12,000 | SAC ¶ 66 |
| Vitamix and personal property taken | $1,500+ | SAC ¶ 65 |
| Production office lease (two-year term at $2,000/month) Part of producer liability to investors | $24,000–48,000 | Exhibit R (Lease Agreement) |
| Relocation L.A. to N.Y. + forced moves (doxing) | $15,000–25,000 | SAC ¶¶ 29, 109 |
| Apple Pay payment under duress | $3,000 | SAC ¶ 37 |
| Unpaid PRODUCER fees — JANE DOE named in production's own EP Budget | $60,000 | ECF 71-15 Page 51, 52 (EP Budget, Acct. 1202) |

| | | |
|---|---|---|
| Unpaid DIRECTOR fees — JANE DOE DGA RATE named in production's own EP Budget, 29 weeks × $15,091 (net after 60% deferral) | $226,369 | ECF 71-15 Page 51, 52 (EP Budget, Acct. 1301) |
| NYLL § 198(1-a) mandatory 100% liquidated damages on unpaid wages ($286,369 total) | $286,369 | N.Y. Lab. Law § 198(1-a) |
| Unpaid crew wages (multiple workers, same production) | $50,000–$150,000 | SAC ¶¶ 28, 169 |
| Film removed from distribution (Skipper and Maloy at Defendant's direction) | $250,000–$2.5m+ | SAC ¶ 98 |
| Lost professional relationships | $50,000–$200,000+ | SAC ¶¶ 96–98, 204 |
| Lost future earnings — 23-year film career (ongoing since Aug. 2023) | $300,000–$1,000,000+ | SAC ¶¶ 42–43, 132 |
| Defamation per se — presumed damages (no proof required) | Presumed by law | Liberman v. Gelstein |
| TOTAL (excl. punitive damages, interest, attorneys' fees) | $1,304,238–$4,512,238+ | Substantially exceeds $75,000 |

**The EP Budget is the most significant damages exhibit in this case.** It is independently verifiable on this Court's own docket at ECF 71-15, Ex. 27 at 51–52. Plaintiff notes that the name entries on the docketed version at pages 51–52 have been redacted to protect Plaintiff's pseudonymous identity pursuant to this Court's prior order permitting the use of pseudonyms. Plaintiff is prepared to provide an unredacted copy to the Court for in camera review upon request, or to confirm the name entries by declaration, if Defendant challenges the redaction. The name that appears in the unredacted budget — under both Account 1202 and Account 1301 — is Plaintiff's professional name, which Defendant knows. It is not Plaintiff's estimate of what she should have been paid. It is the production's own financial planning document, prepared using Entertainment Partners Budgeting software — the industry-standard tool used on every professional film and television production in the United States. Under Account 1202 (Producers), Plaintiff's name — [**JANE DOE**] — appears with a rate totaling $60,000. Under Account 1301 (Director), she is named as [**JANE DOE**] **DGA RATE** at $15,091 per week for 29 weeks, totaling $437,639 before a 60% deferral, netting $226,369. Her total compensation as

23

named in the production's own budget is $286,369. She was paid nothing. The mandatory NYLL § 198(1-a) liquidated damages double that figure to $572,738 by operation of law. Defendant's declaration that no production existed cannot be credited on a Rule 12(b)(6) motion, *Chambers*, 282 F.3d at 153, and is in any event contradicted by the production's own budget document naming Plaintiff with specific professional compensation figures. Federal question jurisdiction also exists independently under 18 U.S.C. § 1595 and through the malicious prosecution and NYLL claims. 28 U.S.C. § 1367.

## VI. JOHN DOE IS PROPERLY BEFORE THIS COURT

John Doe has filed signed declarations on the docket (ECF No. 71-2; ECF No. 88) and submits the accompanying Declaration of John Doe herewith. Defendant's authority, *Johns v. Cnty. of San Diego*, 114 F.3d 874 (9th Cir. 1997), involved a minor who made no filing whatsoever. In the alternative, leave to cure is requested. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2d Cir. 2008); *Foman*, 371 U.S. at 182.

## VII. DEFENDANT ACTED IN CONCERT WITH VEM MILLER, MARK SKIPPER, AND MICHAEL MALOY

Under New York law, a person who knowingly participates in a common scheme or plan with a defendant may be held jointly and severally liable for the resulting torts, even if that person did not commit every tortious act. Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986). Vem Miller moved the defamatory website ending in .info to Ukrainian hosting after the Broome Family Court Order of Protection directed its removal (ECF 88-2), specifically to evade enforcement. Plaintiff had no choice but to commence a separate action against him in this District (Case No. 3:24-cv-1267, ECF 27). Mark Skipper sent the defamatory website to Big Media distribution contacts at Defendant's direction, causing Plaintiff's separate film Quest For Youth to be removed from distribution. Michael Maloy received direct texts from Defendant to amplify the campaign (ECF 71-15, p. 55). Plaintiff Jane Doe has filed a separate action against Skipper and Maloy in the Central District of California, Case No. 2:25-cv-08210-MWC. Each act furthered

the same objective: to destroy Plaintiff's professional reputation and silence her through coordinated public attack. Under Fed. R. Civ. P. 65(d)(2)(C), any injunction issued by this Court binds Defendant, Miller, Skipper, Maloy, and all persons in active concert or participation with them who receive actual notice of the order.

## VIII. EACH CAUSE OF ACTION IS PLAUSIBLY PLEADED

### A. Defamation Libel Per Se (Leave to Add as Standalone Cause of Action)

Five specific false statements, each provably false as a matter of fact, not opinion: (1) "attempted murderer" — a knowing falsehood, because Defendant was fully aware that Plaintiff had been charged only with reckless endangerment, not attempted murder, and Defendant as the complainant who filed the underlying criminal complaint knew precisely what charge it generated; Plaintiff additionally denies the reckless endangerment charge entirely and the proceeding remains pending with significant favorable termination indicators including 1,021 accrued CPL § 30.30 days, undisclosed Brady/Giglio material, and the fact that not a single pre-trial hearing has been held in approximately two years and eight months since the complaint was filed; (2) fraud; (3) thief; (4) dangerous; (5) that Plaintiff's children's father is a child sex offender. The Second Circuit's decision in *Coleman v. Grand*, No. 21-800 (2d Cir. Nov. 3, 2025), illustrates the distinction: that case dismissed claims based on inherently subjective characterizations. These accusations are specific false facts. Published on the top Google result for Plaintiff's name and distributed to named professional contacts. Damages presumed. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). Defendant's dissemination was targeted, not incidental. As reflected in docket exhibits already before the Court (ECF 71-3, 71-4, 71-5, 71-15 including; ECF 84-4 at 51 and Exhibit U), Defendant transmitted the defamatory website and related materials directly to specific individuals connected to Plaintiff. Critically, the record reflects that Defendant sent the defamatory website anonymously to Debbie Bernstein — Defendant's own former landlady — falsely accusing Plaintiff of attempted murder. Bernstein had no independent connection to Plaintiff and no reason to receive such a communication. The

25

only person with knowledge sufficient to identify and contact her in relation to Plaintiff was Defendant himself, whose landlady she was. The anonymity of the communication eliminates rather than conceals its source: no third party would have known to contact Debbie Bernstein about Plaintiff. This supports, at the pleading stage, a strong inference that Defendant was the sender. See *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (circumstantial evidence sufficient to establish publication and identity of sender). There is an additional dimension to the defamation claim that the CJC determination establishes with precision. The New York State Commission on Judicial Conduct found that Justice Lilley forwarded Plaintiff's private court documents to Defendant Jonathan Rees while Plaintiff's criminal case was pending before him, specifically: Plaintiff's August 10, 2023 email to the court; the notice that Plaintiff's public defender application had been denied, with her application attached (included her SSN and Driving License); and a third-party inquiry about attending Plaintiff's court appearance. CJC Det. ¶23. These documents — obtained by Defendant through improper judicial channels confirmed by a formal state determination — subsequently appeared on the defamatory website ending .info, where they remain. Defendant had no legitimate access to Plaintiff's confidential criminal defense materials. He obtained them because a sitting judge was communicating with him ex parte and forwarding them during the proceedings. The website's use of materials that Defendant could only have obtained through this improper judicial pipeline establishes actual malice at its clearest: Defendant knowingly published materials he knew he had received through improper means, from a judge who should not have sent them, in a criminal proceeding where Defendant was the complainant. There is no innocent explanation for how Defendant came to possess Plaintiff's private court filings. The CJC determination provides the explanation: Justice Lilley gave them to him. This chain of custody — from Plaintiff's confidential court filings, through a judge confirmed to be in improper ex parte communication with the complainant, to a defamatory website that remains live — is documented in a published formal determination of a New York State constitutional agency. It corroborates actual malice, intentional publication, and the deliberate character of the defamatory

26

campaign. Defendant's dissemination operated across two distinct target networks. First, Defendant's housing network: Defendant transmitted video footage — footage that appears on the defamatory website ending .info, originating from Defendant's own residence — to Plaintiff's former landlord Thomas D'Angelo, along with materials falsely accusing Plaintiff of scamming an 80-year-old man. D'Angelo was Plaintiff's landlord, not a production crew member. He had no connection to The Respondent or to any professional relationship between Plaintiff and Defendant. The only reason to contact Plaintiff's landlord with defamatory material was to damage Plaintiff's housing stability. This transmission establishes three things simultaneously: (1) Defendant had possession and control of the footage from his own residence, directly corroborating the surveillance and § 52-b claims; (2) the distribution was targeted at Plaintiff's housing relationships specifically, supporting the tortious interference and IIED claims; and (3) the targeting of a landlord — a person with direct power over Plaintiff's housing — demonstrates intentional publication calculated to cause maximum practical harm. Debbie Bernstein, Defendant's own former landlady, was similarly contacted anonymously and received defamatory material falsely accusing Plaintiff of attempted murder. Second, Defendant's production network: a third targeted transmission is documented by the accompanying Declaration of Natalia Elsik. Ms. Elsik worked on The Respondent and CPU with Defendant for years. Defendant introduced her to Plaintiff on a weekly production Zoom call in or around July 2022 that continued for many months until March 2023. Shortly after the defamatory websites were established, Ms. Elsik received an anonymous email using Plaintiff's name with a disturbing attachment. She forwarded it to Plaintiff on September 14, 2023, writing that she found it "deeply disturbing" and noting that "the fact that this person knew I had a connection with someone with the same name as you" was what alarmed her. That observation is legally significant: Ms. Elsik had no public or widely known association with Plaintiff independent of The Respondent production. The only person with knowledge of her connection to Plaintiff through that production was Defendant, who introduced them. The anonymous nature of the transmission, combined with the sender's inside knowledge of the production's crew network,

27

supports a strong inference at the pleading stage that Defendant was the source. Ms. Elsik's declaration further supports the inference that the defamatory distribution was not limited to the known recipients. Defendant had access to the full crew and charity network of The Respondent and CPU. These communications are further corroborated by contemporaneous text messages and emails with investor Doug Ansell (Exhibits S and T), in which Plaintiff is identified as the Producer on record who created the LLC structure, coordinated K1 filings with the investor's CPA, prepared promissory notes, and directed that Mr. Ansell be listed as Executive Producer on both series. In discovery, Plaintiffs will depose more than fifty individuals who worked on or invested in The Respondent production, each of whom will confirm Plaintiff's hands-on role as Producer, including her direction of crew, coordination of investor K-1 filings, and day-to-day business operations. These witnesses include SAG-AFTRA/DGA/WGA/PGA/Teamsters crew members and talent, multiple investors who received direct communications from Plaintiff in her capacity as Producer, charity partners, and distribution contacts — all of whom interacted with Plaintiff in that professional role over the course of the Plaintiff's time on The Respondent production. The number of crew members, investors, and charity workers who may have received the same material is a matter for discovery through subpoena. These targeted transmissions — to Plaintiff's landlord using footage from Defendant's own residence, to Defendant's former landlady anonymously, and to a production crew member who could only have been identified through inside knowledge of the production — establish intentional publication, actual malice, deliberate interference with Plaintiff's housing and professional relationships, and reputational damage extending across multiple distinct personal and professional networks. Continuing publication under *Firth v. State*, 98 N.Y.2d 365 (2002). Equitable tolling: Defendant deliberately moved the website to Ukraine to prevent removal. *Valdez v. United States*, 518 F.3d 173, 182 (2d Cir. 2008). Anti-SLAPP: New York Civil Rights Law § 76-a applies only where the defendant's statements were made in connection with a matter of "public interest." A targeted website campaign naming a private individual as a murderer, fraud, and thief, created for the purpose of destroying her career and silencing her legal claims, is

not a matter of public interest. It is personal retaliation. The Second Circuit's decision in *Coleman v. Grand*, No. 21-800 (2d Cir. Nov. 3, 2025), which dismissed claims based on subjective characterizations of disclosed facts, is distinguishable: Defendant's statements are specific, objectively verifiable false facts — not characterizations of a disclosed relationship. Even if anti-SLAPP applied, actual malice is established by Defendant's own conduct: filing the complaint the same day as sending out videos to Plaintiff's network, the two website launches, privately coordinating with the ADA (Exhibits BB, CC), and being indicted for perjury and false instruments in the same county. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964). Damages are presumed. Leave to add this as a standalone claim is respectfully requested; the factual basis is fully pleaded throughout the SAC and corroborated here.

**B. Intrusion Upon Seclusion and Public Disclosure of Private Facts (Leave to Add)**

Named and pleaded at SAC ¶¶ 54, 104, 147, 574–576, 663–664, 715–719, 724–727, 845–848, 853–862, 871, 877–898, 902–910. These claims require no showing that any statement was false — they protect physical privacy and survive any truth defense independently. Defendant secretly placed Ring cameras in guest bedrooms and bathrooms and recorded Plaintiff and her minor children without consent. The grand jury's Fourth Count provides independent judicial corroboration through a probable cause finding for the identical conduct against another victim at the same property. *Nader v. General Motors Corp.*, 25 N.Y.2d 560 (1970); *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135 (1985); *Doe v. Guthrie Clinic*, 710 F.3d 492 (2d Cir. 2013).

Defendant's motion rests on the assertion that Plaintiff's surveillance allegations are conclusory. They are not. Plaintiff's criminal defense counsel in the Chenango County proceedings reviewed criminal discovery materials and personally observed a bank of monitors at Defendant's property with camera feeds explicitly labeled for private spaces within the residence. Counsel has provided written confirmation of this observation. That written communication is protected by the attorney-client privilege and work product doctrine, and Plaintiffs make no waiver of privilege by referencing its existence here. Plaintiffs have filed a contemporaneous motion

requesting that the Court accept this communication for in camera review before ruling on this motion to dismiss. An attorney's firsthand eyewitness account of physical surveillance infrastructure — obtained through the formal criminal discovery process — is not conclusory; it is corroborating professional testimony. The existence of monitors labeled for private residential spaces, confirmed by counsel reviewing criminal discovery materials, raises Plaintiffs' surveillance allegations well above a speculative level. Dismissal at this stage would require the Court to weigh competing factual narratives, which is impermissible under Rule 12(b)(6).

## C. IIED — Extreme and Outrageous Conduct

The complete sequence: federally prohibited person brandishing illegal loaded weapons before children; inappropriate intimate contact with Plaintiff's 12-year-old daughter; retaliatory 2AM assault with **throat compression and three-hour unlawful restraint** under N.Y. P.L. § 135.00(1); shower assault; children expelled; equipment retained; sustained two-and-a-half-year post-departure campaign including: direct telephone surveillance threat; immigration status weaponization by **Dennis Vacco, Esq., formerly the Attorney General of the State of New York**, acting as Defendant's criminal attorney — whose invocation of his former law enforcement authority to direct an unpaid crime victim not to speak to police carried coercive weight no ordinary attorney's letter could convey; feigned suicide at Plaintiff's home and Defendant's home; death threats; two defamatory websites; false CPS reports; film removed from distribution through named agents; website moved to Ukraine; and false allegation that Plaintiff's children's father is a child sex offender visible as the top Google result for Plaintiff's name, malicious prosecution, including ex-parte communications with presiding Judge in criminal case. Taken together, these allegations describe a sustained course of conduct that plausibly exceeds all bounds tolerated by a civilized society. Even if Defendant disputes these facts, the Court must accept Plaintiffs' allegations as true and draw all reasonable inferences in their favor at this stage. These allegations are detailed, internally consistent, and corroborated by contemporaneous documents — a standard that far exceeds the plausibility threshold under Iqbal

and Twombly.

- *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115 (1993) — sustained deliberate campaigns satisfy outrageousness.

- *Seltzer v. Bayer*, 272 A.D.2d 263 (1st Dep't 2000) — sustained false accusation campaign satisfies outrageousness.

- *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293 (1983) — conduct beyond all bounds of decency.

- *Nelson v. Ulster County*, 789 F. Supp. 2d 345 (N.D.N.Y. 2010) — deliberate malicious harassment sufficient in NDNY.

**D. New York Labor Law §§ 190, 198, and 215 (Leave to Add as Standalone Claims)**

**The EP Budget establishes the wage claim with documentary precision.** As detailed in the damages table in Section V and ECF No. 71-15, Ex. 27 at 51–52, the production's own EP Budget names Plaintiff at $60,000 as producer and $226,369 net as director at DGA rates — $286,369 in total named compensation. She was paid nothing. No good faith defense is available to a man whose own production budget names Plaintiff at those specific professional rates while he didn't pay her anything. Even if Defendant disputes the significance of these documents, they are offered not as proof of ultimate liability but as corroborative context supporting plausibility under Rule 12(b)(6). At minimum, the EP Budget supports a reasonable inference of a structured professional production relationship and anticipated compensation obligations sufficient to state a plausible wage claim. Even if the Court declines to consider these exhibits at this stage, the SAC independently states plausible claims on the wage, fraud, and forced labor causes of action.

**Four contemporaneous documents now corroborate the employment relationship.** ECF No. 71-15, Ex. 27 at 51–52 (EP Budget naming Plaintiff at specific rates); Exhibit R (production office lease showing formally structured production infrastructure); Exhibit S (Plaintiff's email to investor's accountant describing herself as "producer on record" coordinating $100,000 in K1 filings); and Exhibit T (Ansell text exchange where investor asks Plaintiff about LLC structure

31

because his accountant is asking). Together these exhibits establish Plaintiff's producer role as a documented fact, not mere allegation.

**SAG-AFTRA membership.** Defendant is a SAG-AFTRA member. Under Global Rule One, he was personally obligated to ensure the production had executed a basic minimum agreement with SAG-AFTRA before he participated. He presented his membership to Plaintiff during professional due diligence meetings in Los Angeles with his entertainment attorney Todd Lander and talent manager Thomas Harrison (former Ryan Reynolds manager) as evidence that the production would operate under professional industry standards including the compensation standards his own EP Budget confirmed.

**NYLL § 190 wage claim.** New York courts apply the economic realities test. *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013); *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008). The economic realities are now documented in the production's own budget. Under § 198(1-a), mandatory 100% liquidated damages apply absent good faith, doubling $286,369 to $572,738. *Kreisler v. Second Avenue Diner Corp.*, 731 F.3d 184, 194 (2d Cir. 2013).

**NYLL § 215 retaliation.** After Plaintiff left and continued asserting her right to wages, Dennis Vacco, Esq. — formerly the Attorney General of the State of New York, acting as Defendant's criminal and civil attorney — sent a written communication directing Plaintiff not to speak to law enforcement in light of her immigration status. A former state attorney general knows precisely what he is doing when he invokes immigration status to discourage an unpaid worker from asserting legal rights and reporting crimes. This is NYLL § 215 retaliation in its clearest and most deliberate form, compounded by the identity of the attorney who delivered it.

- *N.Y. Lab. Law §§ 190, 198(1-a), 215* — wages, mandatory liquidated damages, retaliation.
- *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) — economic realities test.
- *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008) — employer cannot escape NYLL by misclassifying workers as contractors.

32

- *Kreisler v. Second Avenue Diner Corp.*, 731 F.3d 184 (2d Cir. 2013) — NYLL § 198 liquidated damages mandatory absent good faith.

- *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2d Cir. 2018) — pattern of non-payment across multiple workers.

**E. Common Law Fraud, Fraudulent Inducement, Unjust Enrichment (Leave to Replead)**

Defendant fraudulently induced Plaintiff to sign a production office lease and to invest uncompensated time and resources into The Respondent by representing that she would receive producer compensation and credit. The EP Budget corroborates the fraudulent inducement claim with documentary precision. Defendant signed off on his production budget with Plaintiff included at $60,000 as producer and $226,369 net as director. He presented that same production to her as legitimate through his SAG-AFTRA credentials, his attorney Todd Lander, and his talent manager Thomas Harrison. He directed her to solicit investment from Doug Ansell (documented in Exhibits S and T). He directed her to sign a production office lease in October, 2022 on behalf of The Respondent production. Defendant replaced the original Production Office Lease Agreement — stored in the shared The Respondent Google Drive folder — with a new version on December 2, 2022, a few days before Plaintiff left the property showing malice and intent. In the replacement version, Defendant signed the lease as both lessor (Jonathan Rees, The Respondent LLC) and lessee (Greg Ellis, Wolfcrow) on the same instrument (Exhibit R). He had her run the business side of the production and coordinate investor tax filings. And he paid her nothing, while misappropriating over one million dollars from the production and charity funds. *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413 (1996); *Corsello v. Verizon N.Y.*, 18 N.Y.3d 777 (2012); *Eurycleia Partners*, 12 N.Y.3d 553, 559 (2009).

While serving as Producer on The Respondent, Defendant took Plaintiff's genuine signature from a legitimate letter addressed to talent agents and affixed it without authorization to fraudulent statements that Plaintiff did not write and filed in the publicly available California proceeding Brubaker v. Rees, thereby misusing Plaintiff's identity to advance a malicious

33

prosecution against another woman. Those filings are subject to judicial notice under Fed. R. Evid. 201(b)(2). *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

### F. NYSHRL — § 296-d Controls

N.Y. Exec. Law § 296-d (2019) expressly covers non-employees. Defendant never cites it. *Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998). The EP Budget naming Plaintiff at specific professional rates confirms the engagement was industry-standard. The production office lease (Exhibit R), the investor coordination emails (Exhibits S and T), the Natalia Elsik declaration (Exhibit U) and the EP Budget ECF No. 71-15, Ex. 27 at 51–52, together establish a formal, structured business engagement between Defendant and Plaintiff that falls squarely within the scope of § 296-d — regardless of whether the relationship is characterized as employment or independent contracting. Defendant's failure to address § 296-d in his motion is itself telling; it forecloses the NYSHRL dismissal argument he attempts to advance.

### G. N.Y. Civil Rights Law § 52-b — Direct Personal Threat

Defendant telephoned Plaintiff directly on or around December 10, 2022 and explicitly threatened to release footage from guest bedrooms and bathrooms of her and her children unless she remained silent about everything that had occurred during her stay. She received this threat directly by voice and the specific date remains in her memory because of the threat's impact. This distinguishes *Mira v. Harder*, 177 A.D.3d 426 (1st Dep't 2019). These allegations are further corroborated by the Chenango County grand jury's indictment of Defendant in a parallel criminal proceeding involving a different victim at the same property during the same time period (ECF 71-12). The indictment charges Defendant with unlawful surveillance (Count 4), three counts of coercion via threats to release intimate images (Counts 5–7), and unlawful dissemination of an intimate image (Count 9). The grand jury found probable cause that Defendant engaged in precisely the surveillance and coercive threats to disseminate intimate images that Plaintiff alleges here. This evidence is offered solely for the non-propensity purposes permitted by Fed. R. Evid. 404(b) — to show pattern, plan, and absence of mistake — and

34

further supports the plausibility of Plaintiffs' identical allegations. A grand jury's finding of probable cause that this specific conduct existed and was applied against a different victim at the same property during the same period is precisely the kind of corroborative context that renders the same allegations by Plaintiff plausible at the pleading stage.

**H. Tortious Interference**

Mark Skipper, acting at Defendant's direction, sent the defamatory website to Big Media distribution contacts, causing Plaintiff's separate film Quest For Youth — a production in which Defendant had no involvement — to be removed from the distributor's international catalogue. The tortious interference was specifically targeted because Defendant knew these professional relationships intimately, had worked with Michael Maloy previously, and directed the campaign to destroy Plaintiff's independent work product. Carvel Corp. v. Noonan, 3 N.Y.3d 182 (2004); Guard-Life Corp. v. Parker Hardware Mfg. Corp., 50 N.Y.2d 183 (1980) (defamation as "wrongful means"); Henneberry v. Sumitomo Corp., 415 F. Supp. 2d 423, 465 (S.D.N.Y. 2006).

**I. Forced Labor — 18 U.S.C. §§ 1589, 1590, 1595**

The scheme was operational before the first hour of labor. Five simultaneous tracks:

- **18 U.S.C. § 1589(a)(1) — Physical restraint:** Three-hour unlawful restraint; throat compression; hair pulling. Established independently. No sequencing analysis required.

- **18 U.S.C. § 1589(a)(2) — Financial entrapment:** Defendant directed Plaintiff to solicit investment from Patrick Brennan, and others, including Ansell (Exhibit T) and coordinate K1 filings (Exhibit S) in her capacity as producer, creating personal investor exposure that made departure financially catastrophic by design. The EP Budget shows she was named at $286,369 in compensation that was never paid while investor funds flowed into the LLCs.

- **18 U.S.C. § 1589(a)(2) — Psychological coercion:** Love bombing, manufactured dependency, suicidal threats throughout the working relationship.

- **18 U.S.C. § 1589(a)(3) — Dennis Vacco immigration letter:** After Plaintiff left, **Dennis Vacco, Esq. — formerly the Attorney General of the State of New York —** acting as Defendant's criminal and civil attorney, sent a written communication directing Plaintiff not to speak further to law enforcement in light of her immigration status. This is "the use or threatened use of a law or legal process … for any purpose for which the law was not designed, in order to exert pressure on another person." 18 U.S.C. § 1589(c)(1). The identity of the author — the former top law enforcement officer of New York State — gave this communication significant coercive force. A former Attorney General knows precisely what he is doing when he invokes immigration law to silence a crime victim who is also an unpaid worker. *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).

- **18 U.S.C. § 1589(a)(3) — Attorney threatened investor liability:** Defendant's attorney communicated that departure would expose Plaintiff to investor liability — liability she had created by soliciting Ansell's investment at Defendant's direction. *Adia v. Grandeur Mgmt.*, 933 F.3d 84, 89 (2d Cir. 2019).

The EP Budget independently establishes the labor element of § 1589 through the production's own documentary record. Defendant's declaration that no production had begun cannot be credited on a Rule 12(b)(6) motion, *Chambers*, 282 F.3d at 153, and is directly contradicted by his own budget document naming Plaintiff at specific professional compensation rates. Even if Defendant disputes the existence of the production, Plaintiffs need only allege facts that plausibly give rise to relief — not prove them. The production's own budget naming Plaintiff at specific DGA rates, combined with contemporaneous investor communications corroborating her producer role, satisfies the plausibility standard independently.

- *Adia v. Grandeur Mgmt. Inc.*, 933 F.3d 84 (2d Cir. 2019) — continuous coercive scheme satisfies § 1589.

- *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) — immigration status threats satisfy § 1589(a)(3).

36

- *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) — psychological coercion and financial harm sufficient.

**J. Malicious Prosecution (Leave to Add)**

All four elements corroborated by documentary evidence. (1) **Initiation —** August 8, 2023, same day as Defendant sent videos to entertainment industry professionals followed by two website launches. (2) **Favorable termination —** 1,021 chargeable days accrued; private prosecutorial communications withheld for nearly two years as Brady/Giglio material; the criminal complaint was filed August 8, 2023 and as of the date of this filing — approximately two years and eight months later — not a single pre-trial hearing has been held; CPL § 30.30 dismissal = favorable termination. *Cantalino v. Danner*, 96 N.Y.2d 391 (2001). (3) **Lack of probable cause —** he invited Plaintiff to the property; he directed investors to her as producer (Exhibits S, T); his narrative changed materially within ten days; he was in New York at 98 MPH while claiming to have fled. (4) **Actual malice —** complaint filed same day as an edited video went out to industry professionals followed by two website launches; privately thanking ADA for "offering to help" (Exhibit CC); indicted in same county almost a year to the day on August 9th, 2024 for perjury and false instruments. *Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003); *Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997).

**Independent Favorable Termination Vehicle — The Smithville OOP.** Defendant may argue that the pending criminal case defeats favorable termination on the malicious prosecution claim arising from the August 8, 2023 criminal complaint. Even if that argument had merit — which it does not given the accrued CPL § 30.30 days and the Brady/Giglio violations — a completely independent malicious prosecution claim arises from a separate judicial proceeding: the Smithville Order of Protection. The sequence is as follows. Defendant filed a criminal complaint against Plaintiff on August 8, 2023. The case was initially before Justice Lilley in Smithville Court — a personal friend of Defendant — where Plaintiff appeared as the criminal defendant. During those proceedings, Plaintiff recognized Justice Lilley from photographs of him with

37

Defendant — this was frightening. A few months later due to Grand Jury indictment, the case was subsequently transferred to Chenango County Court before Judge Revoir, which was a relief to Plaintiff given her fear over Justice Lilley presiding over the criminal case. Approximately six months after that transfer, Defendant appeared before Justice Lilley ex-parte — in a court that no longer had jurisdiction over the case — and obtained a three-year temporary Order of Protection against Plaintiff. Justice Lilley had previously presided over Plaintiff's appearance on Defendant's complaint while having a documented personal relationship with the complainant — a mandatory recusal violation under 22 NYCRR 100.3(E)(1)(a) and ACJE Opinion 98-18. The U.S. Supreme Court has held that evidence of actual bias is not required for constitutionally mandated recusal — the standard is whether the probability of actual bias is too high to be constitutionally tolerable. *Rippo v. Baker*, 580 U.S. 285 (2017) (per curiam). The OOP is void on constitutional due process grounds and independently void on statutory grounds: a Justice Court has no authority to issue a three-year OOP; CPL § 530.12(3-a) temporary orders last only until the next court date; and Justice Lilley had no jurisdiction over the matter after transfer to Judge Revoir. Defendant then published the void OOP on social media and filed it in Case No. 3:23-cv-01352 (N.D.N.Y.). Plaintiff discovered the order through those publications, transmitted it to her criminal defense counsel Aaron Dean, Esq., who brought it to Judge Revoir's attention. Judge Revoir vacated the Smithville OOP. That vacation by the court of competent jurisdiction is the favorable termination required for malicious prosecution arising from the OOP proceeding. Every filing of the order in Case No. 3:23-cv-01352 after Judge Revoir's vacation was the knowing filing of a judicially invalidated order in a federal proceeding — the same conduct for which Defendant was indicted under P.L. § 175.35(1). The illegality of the Smithville OOP has now been independently confirmed by a formal determination of the New York State Commission on Judicial Conduct. See Exhibit Z (In the Matter of Jordon R. Lilley, CJC Determination, Feb. 17, 2026). The Commission's findings, set out in detail with specific paragraph references, are as follows. Justice Lilley and Defendant Jonathan Rees exchanged numerous phone calls and emails between August 2023 and March 2025 while Plaintiff's case

was pending. CJC Det. ¶22. The specific calls documented include: two calls from Rees to Lilley and one from Lilley to Rees on August 9, 2023 — the day after Plaintiff's arrest and the same day Lilley issued the first OOP; a call from Lilley to Rees on August 12, 2023, initiated four minutes before Lilley forwarded Plaintiff's own email to Rees, indicating he was on the phone with Rees as he sent it; two calls from Lilley to Rees on September 11, 2023 — the day Lilley issued a second OOP against Plaintiff while the first was still in effect; and a call from Lilley to Rees on May 8, 2024 — six days before Lilley issued the illegal three-year OOP after the case had been divested. CJC Det. ¶22(A)-(K). Justice Lilley also forwarded Plaintiff's own emails to Defendant while the case was pending before him, including: Plaintiff's August 10, 2023 email to the court; the notice of Plaintiff's public defender denial; and a court appearance inquiry. CJC Det. ¶23. When confronted with these facts before the Commission, Justice Lilley testified falsely under oath that he had never emailed Defendant, stating: "I've never emailed Greg Ellis." CJC Det. ¶29. He also falsely testified that the District Attorney had requested all three orders of protection, when the ADAs involved confirmed they had not requested the September 2023 or May 2024 orders. CJC Det. ¶31-32. After being ordered to preserve evidence and swearing under oath that he would do so, Justice Lilley deleted over 500 judicial emails four days later — on February 25, 2025, the first day he held court after his February 21 testimony. CJC Det. ¶35. The Commission retrieved the deleted emails and found within them the very emails Lilley denied sending, including his August 12, 2023 email forwarding Plaintiff's communication to Defendant. CJC Det. ¶36. This is not circumstantial evidence of improper judicial communications. This is a formal state determination with retrieved documentary proof: the judge who presided over Plaintiff's criminal case was communicating directly with the complainant against her, forwarding her private correspondence to the court, coordinating the issuance of orders of protection with him, testified falsely about it, and tried to destroy the evidence. This determination is judicially noticeable under Fed. R. Evid. 201(b)(2) as a public record of a New York State constitutional agency. It directly corroborates the recusal violation under Rippo v. Baker, 580 U.S. 285 (2017) and 22 NYCRR 100.3(E)(1)(a); the malicious

39

prosecution claim arising from the OOP; and the broader pattern of corrupted legal process Plaintiff alleges throughout the Second Amended Complaint. This pattern of improper ex parte judicial contacts is not limited to the Smithville Town Court proceedings. On February 19, 2025, in a separate Family Court proceeding in Broome County (Docket No. O-03679-23/24A) in which Defendant was the respondent on a violation petition of the Order of Protection Plaintiffs had obtained against him, Hon. Mark H. Young recused himself on the Court's own motion after being contacted by a friend of one of the litigants. ECF No. 88-14 (Broome County Family Court Order to Recuse, Feb. 19, 2025). The Court canceled the scheduled trial and referred the matter for reassignment, expressly citing the Code of Judicial Conduct and the appearance of bias. This is the second Judge in proceedings involving Plaintiff and Defendant that a judge has been contacted by either the Defendant or a third party acting on the Defendant's behalf — the first being Justice Lilley, whose contacts with Defendant were confirmed as improper by the CJC. A pattern of judicial recusals caused by third-party contacts in matters involving Defendant is precisely the kind of pattern evidence that Rule 404(b) contemplates: not propensity, but a documented, identifiable method of operation. Plaintiff already held a three-year full stay-away Order of Protection against Defendant issued by Judge Young in Broome Family Court in April 2024 after a full trial. The contrast is complete: a legitimate OOP issued after adversarial proceedings by a court with jurisdiction versus a void OOP issued ex-parte by a judge who was actively communicating with the complainant, in a court that had lost jurisdiction, subsequently vacated by the proper court, and now confirmed illegal by the state's judicial oversight authority. The April 2024 Order of Protection provides a second independent favorable termination ground. Rick Miller II, a former Broome Family Court judge who was removed from the bench by the New York Court of Appeals in 2020 after the New York State Commission on Judicial Conduct sustained charges of sexual harassment, demeaning and sexist comments to a female court clerk, retaliation against another clerk, and failure to report substantial income on his tax returns, is a documented close friend of Defendant. Determination of the New York State Commission on Judicial Conduct, In the Matter of Richard H. Miller, II (Feb. 14, 2020), aff'd, 35 N.Y.3d 1009

40

(2020) (judicially noticeable under Fed. R. Evid. 201(b)(2)). Miller II contacted the Chenango County District Attorney on December 19, 2024 — the day before Defendant's arraignment — in an effort to have Plaintiff charged with Attempted Murder, and subsequently contacted Hon. Mark H. Young in the separate Broome County Family Court violation-of-OOP proceeding against Defendant in February 2025, after which Judge Young recused himself on the Court's own motion (ECF 71-13). Miller II's pattern of improper ex parte contacts continued; in a federal sexual-harassment lawsuit brought by his former secretary (Gallagher v. Miller (N.D.N.Y.)), a federal jury on July 31, 2025 found he had discriminated and harassed her and ordered him to pay $200,000 in compensatory damages, plus attorney's fees. A federal judge denied his post-trial motion for a new trial or remittitur on December 31, 2025. These events corroborate the repeatable method of Defendant using personal relationships with current or former judicial and law-enforcement officials to influence proceedings with Plaintiffs, as alleged throughout the Second Amended Complaint. Dismissal at this stage would require the Court to weigh competing factual narratives, which is impermissible under Rule 12(b)(6).

**Alternative Claim: Abuse of Process.** In the alternative, Plaintiffs request leave to add a standalone abuse of process claim arising from the Smithville OOP. Under New York law, abuse of process requires: regularly issued process, with an intent to do harm without excuse or justification, and use of that process to obtain a collateral objective not legitimate in its use. *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984). Critically, abuse of process does not require favorable termination. *Id.* All three elements are satisfied here. (1) **Regularly issued process:** the Smithville OOP is a judicial order issued by a court. (2) **Intent to harm without justification:** a man who sold his home five months earlier and left New York nine months prior has no legitimate safety justification for seeking a new OOP against the same woman who already holds a full stay-away order against him. (3) **Perverted use for a collateral objective:** the OOP was published on social media and filed in Case No. 3:23-cv-01352 (N.D.N.Y.) before Judge Elisabeth Coombs. The collateral objective — harming Plaintiff's credibility and reputation

41

42

while simultaneously weaponizing a court in which she had no standing to respond — is documented in the timing, publication, and cross-case filing. The void order was subsequently brought to Judge Revoir's attention by Plaintiff's criminal defense counsel and vacated. This is judicial process used as a weapon, not as a shield, in the same pattern as the fabricated criminal complaint filed the same day as the defamatory and harassment campaign started, followed by two website launches ending .com and .info, which is still up today two years and eight months later. Dismissal at this stage would require the Court to weigh competing factual narratives, which is impermissible under Rule 12(b)(6).

## IX. INJUNCTIVE RELIEF IS THE ONLY ADEQUATE REMEDY — CHILDREN REQUIRE PROTECTION

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). All four elements are sufficiently pleaded to survive dismissal and warrant consideration at the appropriate stage.

**Irreparable harm.** The website ending.info is the top Google result for Plaintiff's name. Her film has been removed from distribution. Her children are publicly targeted regularly. *Tom Doherty Assocs.*, 60 F.3d 27, 37 (2d Cir. 1995).

**Inadequacy of money.** Defendant complied with the .com order then moved the .info site to Ukraine with the help of his friend Miller rather than comply. Defendant has further demonstrated an intent to render any judgment uncollectible by selling his New York property, relocating out of state, and structuring his affairs through layered entities and offshore vehicles, as detailed in the Indiana federal court's credibility findings (Exhibit Y). These actions support the necessity of prejudgment asset restraint under N.Y. CPLR § 6301 to preserve the status quo and ensure any eventual judgment is not rendered meaningless. He was found willful by this Court. *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).

**Injunction runs against the person.** *Steele v. Bulova Watch Co.*, 344 U.S. 280, 285 (1952). Under Fed. R. Civ. P. 65(d)(2)(C) the order reaches Miller, Skipper, and Maloy.

**Children require protection.** John Doe's declaration describes what has been done to him. His 12-year-old sister was subjected to inappropriate intimate contact by Defendant. A three-year Order of Protection already acknowledges the threat. *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001).

**Specific relief:** (1) Immediate takedown of website ending.info; surrender of all domain credentials; (2) submission to all major search engine legal removal tools; (3) Rule 65(d)(2) order binding Defendant, Miller, Skipper, Maloy, and all persons in active concert; (4) prohibition on all further defamatory publication targeting Plaintiff or her children; (5) prejudgment asset restraint under N.Y. CPLR § 6301.

## IX.B. PREEMPTIVE RESPONSES TO ANTICIPATED REPLY ARGUMENTS

### 1. "The Court Cannot Consider the Documentary Exhibits on a Motion to Dismiss."

Defendant may argue that the EP Budget, investor emails, and text messages cannot be considered on a Rule 12(b)(6) motion because they are extrinsic to the complaint. This argument fails on multiple grounds. First, the EP Budget and investor communications are documents "integral to the complaint" — they directly corroborate the factual allegations in the SAC regarding Plaintiff's professional role, the production's existence, and the compensation she was owed. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (documents integral to the complaint may be considered on Rule 12(b)(6) motion). Second, and decisively, the SAC independently states plausible claims without these exhibits. Even if the Court declines to consider them at this stage, the motion to dismiss should still be denied. The exhibits strengthen plausibility; they do not create it. Third, the production office lease (Exhibit R) is a document Defendant himself signed. He cannot simultaneously submit his own declaration and argue the Court cannot consider his own signed lease.

### 2. "The EP Budget Is Preliminary, Non-Binding, and Speculative."

Defendant may argue that the EP Budget is merely a preliminary planning document that does not bind the production to pay the amounts listed. This argument misunderstands what the

43

exhibit proves. The EP Budget is not offered as a signed contract. It is offered to show that: (1) a production existed with formal financial planning; (2) Plaintiff was named in that planning document at specific professional rates; and (3) the rate applied — the DGA rate — is the same union minimum that the NYLL and SAG-AFTRA Global Rule One would have required Defendant to pay regardless of whether it appeared in the budget. At the pleading stage, these facts support a reasonable inference of a structured production relationship and anticipated compensation obligations. That is all Rule 12(b)(6) requires. Whether the EP Budget constitutes a binding contract is a factual question for discovery, not a basis for dismissal.

### 3. "Plaintiffs' Allegations Are Implausible and Fantastical."

The Second Circuit has held that plausibility does not require probability. *Iqbal*, 556 U.S. at 678. Plaintiffs' allegations are not fantastical. They are detailed, internally consistent, and corroborated at every level by Defendant's own documented conduct: his own emails to the prosecution (Exhibits BB and CC), his own traffic ticket (Exhibit CC), his own lease signed under two names (Exhibit R), his own production budget naming Plaintiff at specific professional rates ECF No. 71-15, Ex. 27 at 51–52 (redacted); unredacted version available for in camera review upon request, and a nine-count grand jury indictment for the identical conduct against a separate victim (ECF 71-12 and Exhibit DD). Allegations corroborated by a defendant's own documents are not fantastical. They are facts.

### 4. "No Employer-Employee Relationship Existed."

Plaintiffs allege facts supporting an employment relationship under the economic realities test, which looks to the substance of the working relationship, not its label. *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013). Defendant controlled the work; Plaintiff was economically dependent on the production after relocating her family from Los Angeles; the work was integral to his project; the engagement lasted nine months. These allegations are more than sufficient to state a plausible NYLL claim. Moreover, N.Y. Exec. Law § 296-d — which Defendant never cites — expressly covers harassment of non-employees, foreclosing his NYSHRL argument in its

entirety. Whether the relationship was technically employment or independent contracting is a factual question that belongs in discovery, not on a Rule 12(b)(6) motion.

**5. "Malicious Prosecution Fails for Lack of Probable Cause and Favorable Termination."**

Plaintiffs allege specific facts supporting lack of probable cause: On August 8, 2023 — the same day Defendant filed the criminal complaint against Plaintiff — he telephoned his close personal friend, Norwich Chief of Police Rubin Roach to attend his property, who, together with his wife, had previously attended multiple dinner parties and recreational activities at Defendant's home. Ten days later, on August 19, 2023, Defendant materially changed his account and attempted to prosecute Plaintiff's minor children as "accomplices" (Exhibit BB), demonstrating both the absence of probable cause and the fraudulent procurement of the criminal process through a conflicted law-enforcement contact; he had been directing investors to her as producer (Exhibits S, T); and he was receiving speeding tickets in New York while claiming to have fled in fear (Exhibit CC). These facts permit a reasonable inference inconsistent with the existence of genuine probable cause and are sufficient to state a plausible malicious prosecution claim. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). On favorable termination: Plaintiffs allege that 1,021 chargeable days have accrued against the People, that the prosecution's failure to disclose Defendant's private communications with the DA for nearly two years rendered all Certificates of Compliance illusory, and that as of the date of this filing — approximately two years and eight months after the complaint was filed — not a single pre-trial hearing has been held. A prosecution that generates no pre-trial proceedings in nearly three years, with over 1,000 chargeable days accrued, and with undisclosed Brady/Giglio material, is not a prosecution moving toward trial. A CPL § 30.30 dismissal for prosecutorial misconduct constitutes favorable termination. *Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001). These allegations must be accepted as true at this stage.

**6. "Injunctive Relief Is Premature."**

45

Plaintiffs recognize that the ultimate grant of a permanent injunction is an equitable determination. However, a request for injunctive relief need not be resolved at the pleading stage — it survives as long as any underlying claim survives. The ongoing harm alleged here — a defamatory website that remains the top Google result for Plaintiff's name despite a court order directing its removal, moved to a Ukrainian server specifically to evade enforcement — presents precisely the type of continuing irreparable injury that equity acts to prevent. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Defendant has already demonstrated, by moving the website to Ukraine rather than removing it, that monetary damages are inadequate. The adequacy of injunctive relief at this stage is sufficiently supported to survive dismissal.

**7. "Plaintiff's Prior Pleading Errors Demonstrate the Weakness of Her Claims."**

Plaintiff acknowledges directly that earlier filings contained procedural errors. Claims were brought under criminal statutes that carry no private right of action. Certain causes of action lacked sufficient statutory grounding. These were errors made by a pro se litigant navigating complex federal civil procedure without legal training, while simultaneously managing a false criminal prosecution, raising three children, and attempting to rebuild a career being actively destroyed by defamatory websites. They were not errors of fact. None of the dismissed claims were dismissed because the underlying conduct did not occur. They were dismissed because Plaintiff cited the wrong legal vehicle for real injuries. The Second Amended Complaint corrects those errors. The procedural history of this case demonstrates that Plaintiff lacked counsel, not that Defendant did not do what she alleges. Courts have consistently held that pro se submissions must be read to raise the strongest arguments they suggest, and that technical deficiencies in pleading do not defeat claims supported by documentary evidence. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). The EP Budget names Plaintiff at $286,369 in Defendant's own financial planning document regardless of which complaint she filed it in. The nine-count grand jury indictment exists regardless of how many procedural errors preceded it. The documentary record corroborates the allegations in the Second Amended Complaint.

Procedural imperfection in a pro se filing is evidence that Plaintiff did not have a lawyer. It is not evidence that these events did not happen.

**8. "The Court Already Identified Weaknesses in Specific Claims."**

In its March 9, 2026 Memorandum-Decision and Order vacating default, this Court identified potentially meritorious defense arguments on certain claims. Plaintiffs address each directly. On forgery and identity theft: Plaintiffs agree there is no standalone private civil cause of action for forgery or identity theft as independent claims. This Court cited *Shidagis v. Broome Cnty. D.S.S.*, No. 3:23-CV-0031, 2023 WL 198143 (N.D.N.Y. Jan. 17, 2023), and Plaintiffs do not dispute that authority. The SAC does not plead forgery or identity theft as standalone causes of action. The conduct underlying those allegations — forged documents, false filings, fabricated narratives — is pleaded as part of the fraud, fraudulent inducement, defamation per se, and malicious prosecution claims, where it is properly cognizable. On NYSHRL § 296-d: as set forth in Section VIII.F above, Defendant never cited § 296-d in his motion to dismiss, which forecloses his NYSHRL argument entirely. Section 296-d expressly covers non-employees and requires no protected class allegation for harassment by a contractor or principal. On tortious interference: the Second Amended Complaint specifically identifies Mark Skipper sending the defamatory website to Big Media distribution contacts, causing Plaintiff's film to be removed from distribution. Specific third-party business relationships with identified distribution contacts, disrupted by identified conduct by an identified agent at Defendant's direction, satisfies the specificity requirement. On forced labor: Plaintiffs acknowledge this Court's prior expressed skepticism. The SAC addresses that concern by pleading five independent tracks under 18 U.S.C. §§ 1589 and 1590, supported by the EP Budget, the production lease, and the surveillance threat. Plaintiffs do not abandon this claim and respectfully ask the Court to consider the full documentary record before ruling.

**9. "Defendant's Declaration Establishes His Account of Events."**

In his declaration filed September 8, 2025 in support of the motion to vacate default (ECF No. 85-3), Defendant swore under penalty of perjury that he "recently learned of this lawsuit from my insurance carrier." ECF No. 85-3 ¶ 13. This Court found, in its March 9, 2026 Memorandum-Decision and Order, that Defendant was aware of this action since at least December 10, 2024 — the date he filed documents in Case No. 3:23-cv-01352 that specifically referenced this action. ECF No. 97 at 8. The Court further found this conduct constituted "egregious insolence" that "could be enough to find no good cause to vacate the default." Id. at 12. Defendant filed his declaration nine months after he had documented knowledge of this action, swearing he had only recently learned of it. That is a false sworn statement submitted to this Court. In the same declaration, Defendant swore that he had no connection to the Roscoe Street address — yet this Court noted that in his December 10, 2024 filing in Case No. 3:23-cv-01352, Defendant himself referred to the Roscoe Street address as his "confidential address." ECF No. 97 at 8. His own words in a federal filing describe it as his address. His own declaration to this Court, submitted nine months later under penalty of perjury, describes it as a location he has never visited and has no connection to. Thirty paragraphs of that declaration deny specific allegations in the Second Amended Complaint — including that no production existed (contradicted by Exhibit U), that Plaintiff was never employed (contradicted by Exhibits R, S, and T), and that no intimate relationship existed (denied, but unresolvable on the pleadings). A declaration that contains at least two statements this Court has already found inconsistent with documented evidence is not a declaration that establishes Defendant's account of events. It is a declaration that confirms the pattern of false sworn statements documented across three independent judicial proceedings. At the Rule 12(b)(6) stage, the Court accepts Plaintiff's allegations as true. Defendant's declaration is not evidence. It is a contested factual narrative submitted by a party whose credibility has been questioned by this Court, by a second federal judge after live cross-examination, and by a grand jury that found probable cause he committed perjury.

## X. CONCLUSION — THIS CASE MUST BE HEARD ON THE MERITS

48

**A. This Court Gave Defendant a Second Chance. The Record Before the Court Now Warrants Proceeding to Discovery.**

Defendant defaulted for eighteen months. This Court found that default **willful** and yet extended the opportunity to be heard on the merits. He responded with a motion that challenges Plaintiff's credibility while his own production budget names her as a paid professional, his own lease shows him signing both sides under two different names, his own investor's texts confirm her producer authority, and his grand jury indictment documents the identical conduct against a separate victim.

There is an additional dimension to this motion that the Court should consider. In his motion to vacate the default, Defendant himself argued that this case should be heard on the merits. Having successfully obtained that relief from this Court on that basis, Defendant cannot now turn around and argue that the same case should be dismissed rather than heard. A party who persuades a court to take action by asserting a particular position may not thereafter take a contrary position in the same proceeding to the prejudice of the opposing party. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (judicial estoppel applies where party "intentionally misled the court to gain unfair advantage"). Defendant argued that justice required a merits hearing when he needed to escape the entry of default against him. He now argues that justice requires dismissal before the merits can be examined. He cannot have it both ways. His own motion to vacate is the most compelling argument for denying this motion to dismiss: Defendant himself told this Court that this case deserves to be heard. Plaintiffs agree. The Court should hold him to that position.

**B. Plaintiffs Have Complied. The Documents Now Confirm the Truth.**

Jane Doe and John Doe has complied with every order of this Court, without an attorney, while Jane Doe raises three children, navigating a false criminal prosecution, and managing the ongoing destruction of her career by a website ending .info still live in violation of a court order. The technical imprecision that led to certain causes of action being pleaded throughout the SAC

but not formally designated as named causes of action reflects exactly the inadvertence that the Second Circuit's pro se solicitude doctrine exists to protect. *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). The facts were always there. The documents now confirm them.

**C. Discovery Will Establish the Full Truth**

The following evidence exists and is obtainable by subpoena: the Ring footage Defendant transmitted he had to the DA but never produced; Defendant's private communications with the Chenango County ADA, DA and Rick Miller II; SAG-AFTRA signatory records for Monkey Toes and The Respondent LLC; corporate and financial records for the Defendant, his Trusts, The Respondent LLC, Monkey Toes, Children and Parents United (CPU) and Wolfcrow; the complete EP Budget with all department totals; K1s and tax returns filed for the Defendant, his corporations, his charity CPU, investor Ansell; the signed Las Vegas investor agreement; the written immigration status letter from Dennis Vacco; Defendant's offshore financial records; and crew depositions and declarations from multiple workers on the same production. Every document listed here exists, has a custodian, and is reachable by subpoena.

**D. Plaintiffs Ask for Their First Chance — This Court Gave Defendant His Second**

This Court gave Defendant a second chance despite finding him willful. Plaintiffs are asking for their **first** chance — to have this case heard on its facts, with the documents now before the Court. Plaintiffs have not defaulted. They have not moved evidence to foreign countries. They have simply tried to tell the truth about what was done to them and Jane Doe's minor children, without an attorney, in federal court. That truth is now not only alleged. It is documented.

At this stage, the question before the Court is not whether Plaintiffs will ultimately prevail, but whether they have plausibly alleged claims for relief. Dismissal at this stage would require the Court to weigh competing factual narratives, which is impermissible under Rule 12(b)(6). Given the detailed factual allegations, the corroborating documentary evidence, and the Second Circuit's instruction to construe pro se pleadings to raise the strongest possible claims, dismissal would be inconsistent with Rule 12(b)(6). The New York State Commission on Judicial

Conduct's February 17, 2026 Determination (Exhibit Z) now provides independent, official corroboration of the corrupted legal process and ex parte contacts Plaintiff has alleged from the outset — confirming that the criminal proceeding Defendant cites as the centerpiece of his defense was itself compromised by his own conduct. Discovery — not dismissal — is the appropriate vehicle for resolving the factual disputes Defendant raises. For all the foregoing reasons, Plaintiffs respectfully request:

- **DENY** Defendant's Motion to Dismiss the Second Amended Complaint in its entirety.

- **GRANT** leave to replead the Seventh and Eighth Causes of Action as fraud, fraudulent inducement, and unjust enrichment if dismissed.

- **GRANT** leave to add: defamation libel per se; intrusion upon seclusion; public disclosure of private facts; N.Y. Labor Law §§ 190, 198, and 215; and malicious prosecution.

- **PERMIT** John Doe to formally adopt the SAC through his accompanying declaration.

- **ORDER** injunctive relief: immediate takedown of website ending .info; surrender of domain credentials; Google de-indexing; prohibition on defamatory publication; Rule 65(d)(2) order binding Defendant, Miller, Skipper, Maloy, and all persons in active concert.

- **ORDER** prejudgment asset restraint under N.Y. CPLR § 6301.

- **GRANT** such other and further relief as the Court deems just and proper.

This case should be heard on the merits. Plaintiffs ask this Court for that opportunity.

Respectfully submitted,

Dated: 5th April, 2026

51

_Jane Doe_

———————————————————

Jane Doe, Pro Se

_J. Doe_

———————————————————

John Doe, Pro Se

_Submitted with: Declaration of Jane Doe; Declaration of John Doe; Exhibit W Declaration of Dana Rees (Fed. R. Evid. 404(b) — pattern, intent, absence of mistake); Exhibit U Declaration of Natalia Elsik (corroborating production crew existence, Defendant's introduction of Plaintiff to production network, and anonymous targeted distribution of defamatory material to crew member); Declaration of Jane Doe in Support of Motion for In Camera Review; (Aug. 23, 2023 DA email); Exhibit BB (Aug. 19, 2023 accomplices email); Exhibit CC (Aug. 18, 2023 traffic ticket); Exhibit DD Special Prosecutor Response to Defendant's Omnibus Motion (Jul. 18, 2025); Exhibit R (Production Office Lease, Dec. 2, 2022); Exhibit S (Email to Ben Smith CPA and Doug Ansell, Feb. 2, 2023); Exhibit T (Text messages with Doug Ansell, Jan. 31, 2023); Exhibit W (Six Index Cards submitted by Dana Rees to California court in restraining order proceedings against Defendant, authenticated by Declaration of Dana Rees — California court case; Exhibit X (Cover page listing nine docket entries from Case No. 3:23-cv-01352 (N.D.N.Y.) before Judge Elisabeth Coombs in which Defendant filed documents concerning Plaintiff Jane Doe — ECF 71-15/Ex. 26 (June 3, 2024); ECF 37, 37-1 (June 17, 2024); ECF 82 (Dec. 6, 2024); ECF 78 (Dec. 8, 2024); ECF 84, 84-2, 84-3, 84-4 (Dec. 10, 2024); ECF 110 (Aug. 27, 2025); ECF 112 (Aug. 27, 2025); ECF 113 (Aug. 28, 2025); Transcript (Sept. 3, 2025) — judicially noticeable under Fed. R. Evid. 201(b)(2); no merger of cases sought); Exhibit Y (Opinion and Order, Doe v. Rees, No. 3:25-cv-00133-DRL-SJF (N.D. Ind. Mar. 18, 2026) — federal judicial credibility findings after evidentiary hearing and live testimony; judicially noticeable under Fed. R. Evid. 201(b)(2); offered under Fed. R. Evid. 404(b) for pattern, not propensity); Exhibit Z (Determination of the New York State Commission on Judicial Conduct, In the Matter of Jordon R. Lilley, Feb. 17, 2026 — finding that Justice Lilley illegally issued the ex parte OOP against Plaintiff when the case was no longer pending in his court; that he provided false testimony denying emails and communications with Defendant; and that he deleted over 500 judicial emails after a preservation order; judicially noticeable under Fed. R. Evid. 201(b)(2) as a public record of a New York State agency); Michael Maloy text exhibits (on docket). Also submitted: Motion for In Camera Review of Privileged Communication (attorney-client / work product) — Exhibit V tendered directly to the Court for in camera review, not filed on public docket._